## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana;<br><br>*Plaintiff,*<br><br>vs.<br><br>UNITED STATES POSTAL SERVICE; and LOUIS DEJOY, in his official capacity as Postmaster General,<br><br>*Defendants.* | Case No. CV-20-79-GF-BMM<br>_____<br><br>**COMPLAINT FOR MANDAMUS, DECLARATORY, AND INJUNCTIVE RELIEF** |

In 1895, Mary Fields became the first African American woman—and only the second woman in the United States—to obtain a United States Post Office Department contract to be a Star Route Carrier. The quickest applicant to hitch a team of six horses, Fields was already in her early sixties when she won the contract. For eight years, she rode the 17-mile route between Cascade, Montana, and St. Peter's Mission, braving harsh weather, wolves, and rough road conditions—while wielding a rifle and revolver to fend off bandits and thieves. Her relentless reliability soon earned her the nickname Stagecoach Mary. She never missed a day of mail delivery. When the snow was too deep for her horses, Fields snowshoed her route. She was beloved in her community: when she died in 1914, her funeral was said to be among the most well attended in Cascade's history.

Fields, extraordinary though she was, represents only one of countless moments

that the U.S. Post Office has defied the odds and delivered the mail. The Post Office began at this nation's founding, led by Benjamin Franklin as the first U.S. Postmaster General during the American Revolution. The Constitution specifically granted Congress the authority to establish Post Office and post roads. U.S. Const. Art. 1, § 8, cl. 7. George Washington and Thomas Jefferson both saw the Post Office as essential to distributing newspapers, and Congress legislated postal rates so low for newspapers and magazines that they were subsidized by overcharging for letter postage and through Congressional funding authorizations.

Americans, especially Montanans, have long relied on the Post Office to timely deliver essential goods and services. Montana veterans and seniors rely on the mail for the delivery of life-saving medication. Small businesses in Montana need reliable mail to remain competitive. Montana's state government uses the mail to fulfill a wide array of necessary services, for everything from delivering tax notices to providing relief to Montanans and Montana businesses affected by the COVID-19 pandemic. In 2018, the mail allowed hundreds of thousands of Montanans to turn in their absentee ballots on time. And, in 2020, the vast majority of registered voters in Montana reside in counties that will again rely on the mail to timely deliver mail ballots and avoid the risks of in-person voting associated with the COVID-19 pandemic.

Notwithstanding more than two centuries of on-time service, the newest Postmaster General, Louis DeJoy, has taken steps that undermine an institution that

dates to the founding. In Montana, the effects of DeJoy's actions to degrade the United States Postal Service are particularly acute, and they present an immediate and irreparable harm to the people of this State and to the ability of state government to perform its essential functions. These changes fall especially hard on Montanans in rural areas and older Montanans, who not only rely heavily on the mail, but who are uniquely vulnerable to the risks that in-person interactions present as a result of the global pandemic. Nearly 45 percent of Montanans live in rural areas. Nearly 20 percent of Montanans are over age 65.

In July, DeJoy directed the Postal Service to begin eliminating overtime pay for postal workers even though he knew it would cause delivery delays. Then in August, the Postal Service began removing and destroying mail-sorting machines across the country without warning. The removal and destruction of postal equipment in Montana has been well documented. These changes were unlawful. They were taken *ultra vires*, occurring outside the legal process required to make policy changes to postal services—and undoubtedly required where the Postal Service seeks  changes derogatory to the quality of mail delivery. Though in response to public outcry, DeJoy has made public pronouncements that he may slow these changes, the Postal Service's unlawful actions under DeJoy's direction have already wrought irreparable harm in Montana. Further lawless, disruptive action by DeJoy and the Postal Service will continue to sow chaos.

Governor Bullock, the chief executive of the State of Montana who is vested with the duty to oversee state agencies and programs that provide essential services using the mail—as well as with the authority and responsibility to respond to emergencies affecting the public health—brings this suit for declaratory and injunctive relief because DeJoy and the Postal Service acted outside their authority and in violation of federal law. Their actions have directly harmed Montanans, impeding the flow of mail, including medical prescriptions, replacement parts for farm machines, utility bills, stimulus checks, applications for jobs and higher education, and other essential communications, not to mention crucial state services like the provision of unemployment checks, administration of Montana's child protection laws, and furnishing mail ballots. The impact is particularly great on reservations and in rural communities. Montanans have a profound interest in mail delivery and DeJoy has improperly debilitated the Postal Service.

## I.   JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because federal law governs suits against the Postal Service under 39 U.S.C. § 409. *See Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. 06-cv-726 (CKK), 2007 WL 2007578, at *7 (D.D.C. July 6, 2007). The Court has jurisdiction to award the requested mandamus relief pursuant to 28 U.S.C. § 1361 and declaratory and other relief pursuant to 28 U.S.C. § 2201.

2.     Venue is proper in the District of Montana, Great Falls Division, because a substantial part of the acts or omissions giving rise to the claims occurred or will imminently occur in this judicial district. 28 U.S.C. §§ 1391(b)(2), (e)(1). In particular, a substantial volume of mail is delivered in and around the Great Falls area and, as is true throughout the State, the Governor relies on the Postal Service to timely deliver that mail on behalf of State Government. Mail sent or received by state government in Helena is routed and sorted through a USPS processing facility in Great Falls. In addition, the Postal Service has already decommissioned an AFCS100 machine located in Great Falls that was used for processing up to 30,000 pieces of mail per hour.

## II.   PARTIES

3.     Steve Bullock is the Governor of Montana. He is the State's chief executive and exercises supervisory authority over the executive branch of Montana's State Government pursuant to the Montana Constitution and state statute. The Governor is vested with the constitutional duty to see that the laws are faithfully executed. Mont. Const. art. VI, § 4. He is also vested with the authority and responsibility to take necessary action to respond to emergencies affecting the public health. Mont. Const. art. VI, § 13; Mont. Code Ann. §§ 10-3-101, 10-3-104, 10-3-305. And he uses the postal service in his official capacity through the Governor's Office and as part of his duties overseeing executive branch agencies, which use the postal

service in huge volumes to communicate with and provide essential services to Montanans. Governor Bullock sues in his official capacity.

4.     Defendant Louis DeJoy is the Postmaster General, the chief executive officer of the Postal Service. He is sued in his official capacity.

5.     Defendant United States Postal Service is an independent agency of the executive branch of the United States. Congress has waived the Postal Service's immunity from suit. 39 U.S.C. § 401.

## III.   LEGAL & FACTUAL BACKGROUND

### A. The Postal Service's constitutional origins and existing statutory framework.

6.     Article 1, Section 8, clause 7 of the U.S. Constitution vests Congress with the power to "establish Post Offices and Post Roads." In 1792, Congress passed and President George Washington signed the Postal Service Act, which established the U.S. Post Office Department.

7.     The Postal Service "was prefigured by the Continental Congress' appointment of Benjamin Franklin to be the first Postmaster General, on July 26, 1775 . . . . From those beginnings, the Postal Service has become the nation's oldest and largest public business." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,* 540 U.S. 736, 739 (2004) (internal citations and quotation marks omitted).

8.     After independence, James Madison described the postal system as "the principal channel through which a general knowledge of public affairs, was diffused."

Ray Brescia, *The USPS is a crucial tool for democracy—helping the left and the right organize*, The Wash. Post (Aug. 17, 2020), https://www.washingtonpost.com/outlook/2020/08/17/usps-is-crucial-tool-democracy-helping-left-right-organize/.

Madison was not alone. George Washington and Thomas Jefferson also commented on the central importance of the postal system in promoting a healthy exchange of news, ideas, and opinions. Historian, *About: Postage Rates for Periodicals: A Narrative History*, United States Postal Service (June 2010), https://about.usps.com/who-we-are/postal-history/periodicals-postage-history.htm. Alexis de Tocqueville travelled the United States in part by mail coach, writing that "the mail, that great link between minds, today penetrates into the heart of the wilderness." Casey Cep, *We Can't Afford to Lose the Postal Service*, The New Yorker (May 2, 2020), https://www.newyorker.com/news/annals-of-communications/we-cant-afford-to-lose-the-postal-service.

9.    In 1970, Congress passed the Postal Reorganization Act (PRA), *see* Public Law 91-375, 84 Stat. 719, giving the Postal Service its current name and making it "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. The PRA also placed the Postal Service "under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. It was amended by the Postal Accountability and

Enhancement Act of 2006 (PAEA). *See* Public Law 109-435, 120 Stat. 3198.

10.     The PRA made several changes intended "to increase the efficiency of the Postal Service and reduce political influences on its operations." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004). The PRA describes the Postal Service as "a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a).

11.     Among its priorities, the PRA mandated that it when "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).

12.     Consistent with this directive, it is a cardinal duty of the Postal Service to "plan, develop, promote, and provide adequate and efficient postal services." 39 U.S.C. § 403. "The Postal Service shall serve as nearly as practicable the entire population of the United States." *Id.*

13.     Moreover, the Postal Service must "operate[] as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). It has "as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business

8

correspondence of the people. It shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." *Id.*

14.     Today, the Postal Service employs over 500,000 workers. Its carriers deliver more than 470 million pieces of mail each day.

15.     Congress has directed the Postal Service to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," in determining all postal services policies. *Id.* § 101(e).

16.     Pursuant to the PAEA, the Postal Service has promulgated regulations setting service standards for different classes of mail. 39 C.F.R. Part 121. These regulations dictate how long the Postal Service should take to deliver mail under various circumstances. For example, for First Class mail, most letters within the contiguous 48 states are to be delivered within 1–3 days. 39 C.F.R. § 121.1.

17.     The PAEA also gives postal customers a private right of action to sue the Postal Service if they believe the Postal Service standards do not comply with statutory objectives or otherwise fail to comply with its regulations. 39 U.S.C. §§ 3691(d); 3662.

18.     To oversee the Postal Service, the PRA created a board of 11 governors. 39 U.S.C. § 202(a). Subject to the advice and consent of the Senate, the President appoints nine of those governors, who in turn appoint the tenth governor to serve as the Postmaster General. *Id.* § 202(c). The ten governors then appoint an eleventh,

who serves as the Deputy Postmaster General. *Id.* § 202(d). The PRA also created what is now called the Postal Regulatory Commission as another "independent establishment of the executive branch." *Id.* § 501. The Commission is made up of five presidentially appointed members, all "chosen solely on the basis of their technical qualifications, professional standing, and demonstrated expertise in economics, accounting, law, or public administration." *Id.* § 502.

## B. The Postal Regulatory Commission must follow certain procedures.

19.    The Commission and its procedures are an important structural safeguard against hasty or uninformed policy changes that would degrade the quality of mail service.

20.    Under the PRA and the PAEA, if the Postal Service proposes changes that "will generally affect service on a nationwide or substantially nationwide basis," the proposed changes must be considered by the Commission. 39 U.S.C. § 3661(b).

21.    To effect any such change, the Postal Service must first "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* Specifically, the Commission's Rules of Practice and Procedure require the Postal Service to file requests "not less than 90 days before the proposed effective date of the change in the nature of postal services involved." 39 C.F.R. § 3020.112.

22.    Before issuing an advisory opinion, the Commission must hold a hearing

on the record. *Id.* § 3661(c). The public is entitled to submit comments in proceedings before the Commission. 39 C.F.R. § 3010.140. The Commission's rules permit two forms of voluntary participation in its proceedings: (1) A person may file a notice of intervention pursuant to 39 C.F.R. § 3010.142(a) and, as a party, participate in discovery and motions practice, file testimony, and submit briefs, among other rights and responsibilities; and (2) a person may participate by submitting comments in proceedings before the Commission except those involving an appeal of a Postal Service determination to close or consolidate a post office, pursuant to 39 C.F.R. § 3010.140.

23.    And 39 U.S.C. § 3661(c) provides: "The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."

## C. In the past, the Postal Service has sought changes in compliance with procedural requirements.

24.    As required by section 3661, the Postal Service has in the past submitted proposed changes regarding the nature of postal services with potential nationwide effect to the Commission within a reasonable time prior to the effective date of the proposal and requested an advisory opinion from the Commission.

25.    For example, in 2014, the Postal Service sought an advisory opinion on

11

a proposal to change the manner by which it processes and dispatches mail that qualifies for a discounted price. For certain mail entered on Fridays or Saturdays, the Postal Service proposed to change the delivery expectation or delivery service standard from 3 days to 4 days. The Commission's advisory opinion recommended that the proposal required more study. After receiving comments and briefs from intervenors, the Commission found, among other things, that the Postal Service's proposal was based on limited test information and sometimes anecdotal accounts, and it noted concern that the proposal did not have sufficient "support within the mailing community." PRC, Advisory Op. on Service Changes Associated with Standard Mail Load Levels, N2014-1 at 1 (Mar. 26, 2014), https://www.prc.gov/docs/89/89493/docket%20no.%20n2014-1_advisory%20opinion.pdf; *ibid.* at 5 (noting comments).

26. Similarly, in 2012, the Postal Service sought an advisory opinion under section 3661 on a proposal to reduce the hours of operation at more than 13,000 post offices nationwide by 6, 4, or 2 hours per weekday, and to increase hours at approximately 73 locations. The Postal Service stated that its proposed plan was intended "to achieve cost savings with limited reductions in access and service," and included provisions for soliciting community input with respect to the changes in hourly operations at specific offices. After soliciting public comment, the Commission made recommendations concerning access, community input, revenue, and staffing." PRC, Advisory Op. on Post Office Structure, N2012-2, at 1–2 (Aug. 23, 2012),

https://www.prc.gov/docs/85/85013/n2012-2_adv_op_082312.pdf.

**D. Recent changes in postal service policies create widespread mail delays.**

27.     In May 2020, the U.S. Postal Service's Board of Governors, whose members were appointed by the President, selected Louis DeJoy to serve as the 75th Postmaster General.

28.     Before becoming Postmaster General, DeJoy was on the board of directors at XPO Logistics, a transportation and logistics company that does business with the Postal Service and federal agencies. DeJoy continues to own equity in XPO Logistics, totaling between $30 million and $75 million, in addition to owning stock options in Amazon, a Postal Service competitor and courier.

29.     DeJoy is the first Postmaster General in over twenty years who did not rise through the Postal Service's ranks to attain his position.

30.     Soon after beginning his term in June, DeJoy instituted broad operational changes, which he acknowledged were "transformative" changes that have "had unintended consequences that impacted [the Postal Service's] overall service levels." Louis DeJoy, *PMG addresses restructuring*, Postal Times (Aug. 13, 2020), https://bit.ly/2Q1JDDm.

31.     DeJoy has taken several actions that have delayed the mail and reduced the Postal Service's service on a substantially nationwide basis. The "transformative" changes include: (i) eliminating overtime pay for certain postal workers; (ii) instructing

carriers to leave mail behind, rather than deliver it, in certain circumstances; (iii) decommissioning sorting machines; (iv) removing mailboxes; (v) reducing operating hours; and (vi) changing how election mail is classified and charged.

32.     To begin, DeJoy eliminated overtime pay necessary to complete the daily work of the post office and obtain timely mail service. This change caused delays in timely mail delivery, a foreseeable consequence of the decision that DeJoy knew when he made it.

33.     Choosing to eliminate overtime places increased stress on the postal system as COVID-19 has forced thousands of postal workers to quarantine or stay out sick.

34.     Next, carriers have been instructed to leave mail behind on the workroom floor or docks if taking it would cause a worker to incur overtime, thus resulting in mail delays for countless thousands of pieces of mail. Jacob Bogage, *Postal Service overhauls leaderships as Democrats press for investigation of mail delays*, Wash. Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigation-dejoy/. DeJoy mandated that carriers cannot make additional trips from a facility even if carriers determine that additional trips are necessary to ensure timely distribution of letters and parcels. Under DeJoy's policy changes, carriers must also "return [from mail routes] on time" even if they have not fully completed their deliveries for the day.

14

35.    Postal workers were previously trained not to leave letters behind and to make multiple delivery trips to ensure timely distribution of letters. DeJoy wrote to employees, "if we cannot deliver all the mail due to call offs or shortage of people and you have no other help, the mail will not go out[.]" *See* Nicole Goodkind, *Inside Trump's war on the postal service*, Fortune Mag. (Aug. 14, 2020), https://fortune.com/2020/08/14/usps-trump-mail-in-voting-postal-service-2020-election-stamps-post-office/.

36.    Postal workers report that the mail is piling up in their offices, backing up mail across the country.

37.    At the same time, 671 machines used by the Postal Service to organize and sort letters or other pieces of mail have been or will be removed from dozens of cities across America, effectively decommissioning 10 percent of the Postal Service's sorting machines between June and September of 2020.

38.    This choice has already affected Montana directly, where sorting machines in Great Falls, Missoula, and Billings are being taken offline and disassembled. Maritsa Georgiou, *Leaked photos show disassembled USPS machines in Montana*, NBC Mont. (Aug. 20, 2020), https://nbcmontana.com/news/local/leaked-photos-show-disassembled-usps-machines-in-montana.

39.    The machines being removed—Automated Facer-Canceler Systems, Delivery Bar Code Sorters, Automated Flat Sorting Machines, and Flat Sequencing

Systems—can label and sort tens of thousands of paper mail items; such as letters, bills, and ballots; each hour. The 671 machines nationwide have the capacity to sort over 21 million pieces of mail per hour. They allow carriers to spend more time delivering mail rather than organizing it at a facility.

40.     The removal of machines both inside and outside Montana affects the timely delivery of some mail to Montana, including to state government. *See* Brian Slodysko, *Report: Post Office warns 46 states about mail voting delays*, The Columbian (Aug. 14, 2020), https://www.columbian.com/news/2020/aug/14/report-post-office-warns-46-states-about-mail-voting-delays/.

41.     The Postal Service dismantled a sorting machine in Great Falls capable of sorting thousands of pieces of mail per hour. Tom Lutey, *More details emerge about dismantled mail equipment in Montana*, Billings Gazette (Aug. 21, 2020), https://billingsgazette.com/news/state-and-regional/govt-and-politics/more-details-emerge-about-dismantled-mail-equipment-in-montana/article_8edeed28-da9c-5248-866a-8f229eb972a8.html.

42.     State agencies from the Department of Public Health and Human Services to the Department of Labor & Industry have reported mail service delays affecting their ability to perform essential functions and to provide services required by state law. The Governor's Office also relies on the mail to communicate with constituents and has faced delays in the receipt of and response to such

communications. This impacts the extent to which the Governor's Office is able to assist constituents in need of state services. All state agencies under the Governor's supervision use and rely on the postal service.

43.    Postal Service employees have personally witnessed machines that cost millions of dollars being "destroyed or thrown in the dumpster." Aaron Gordon, *Internal USPS Documents Outline Plans to Hobble Mail Sorting*, Motherboard (Aug. 14, 2020).

44.    According to the Postal Service's Equipment Reduction Plan, the Postal Service has set a "target" of reducing 969 total machines by the end of fiscal year 2020, with the majority being removed by September 30, 2020.

45.    Responding to widespread alarm and criticism over the recently decommissioned sorting machines, the President's Chief of Staff, Mark Meadows, asserted in an interview that "[s]orting machines between now [August 16, 2020] and Election Day will not be taken offline." But Meadows continued that this freeze applied to machines that were not part of an "already scheduled reallocation." *Tapper presses Meadows on mail-in voting*, CNN (Aug. 16, 2020), https://cnn.it/3iOeXCc. Meadows did not respond to questions about sorting machines that were recently decommissioned and why they were taken offline.

46.    The Postal Service has also confirmed that dozens of mailboxes were removed in parts of New York, Pennsylvania, Oregon, and Montana. Specifically, in

Montana, boxes in Bozeman, Glendive, Helena, Lewistown, Livingston, Manhattan, and Shelby were actually removed.

47.    Finally, the Postal Service has warned state elections officials that they will no longer treat election mail as First Class mail and that state election officials must in all cases pay First Class postage to ensure timely delivery. The Postal Service's prior practice was to process and deliver election mail as First Class regardless of the paid class of service. *Service Performance of Election & Political Mail During the 2018 Midterm & Special Elections*, USPS Office of the Inspector General, Audit Report No. 19XG010NO000-R20 (Nov. 4, 2019). First Class mail normally has a delivery standard of 1–3 days, while Nonprofit Marketing Mail has a delivery standard of 3–10 days.

48.    A Postal Service Inspector General report on the 2018 election found that 95.6 percent of election and political mail was delivered within the 1–3 day service standard applied to First Class mail. This is near the Postal Service's overall goal of delivering 96 percent of First Class mail within the 1–3 day service standard and indicates that election mail was processed across the country as if it were First Class mail. *Id.*

49.    On August 7, 2020, DeJoy centralized his control over the Postal Service by reassigning or displacing twenty-three postal executives, including the two top executives who oversee day-to-day operations. Jacob Bogage, *Postal Service overhauls*

*leaderships as Democrats press for investigation of mail delays*, Wash. Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigation-dejoy/.

### E. Timely, regular mail delivery is essential to protect Montanans during the COVID-19 pandemic.

50.     COVID-19 presents no ordinary public health crisis; it is a once-in-a-century global pandemic. See *Altman v. Cty. of Santa Clara*, 2020 U.S. Dist. LEXIS 97535, at *3 (N.D. Cal. June 2, 2020) ("Experts consider this outbreak the worst public health epidemic since the influenza outbreak of 1918.").

51.     Nearly 6.3 million Americans have been infected with COVID-19; more than 185,000 have died. Centers for Disease Control & Prevention, *Cases in the U.S.* (June 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. Montana has fared better, but still, more than 8,000 Montanans have been diagnosed, dozens have been hospitalized, and more than 115 have died. Montana Response: COVID-19 – Coronavirus – Global, National, and State Information Resources, *MT COVID-19 Cases*, (last accessed Aug. 27, 2020) https://montana.maps.arcgis.com/apps/MapSeries/index.html?appid=7c34f3412536 439491adcc2103421d4b.

52.     On March 12, 2020, Governor Bullock declared a state of emergency in Montana that remains in place today. Mont. EO No. 2-2020 (Mar. 12, 2020), *available at* https://covid19.mt.gov/Portals/223/Documents/EO-02-2020_COVID-

19%20Emergency%20Declaration.pdf?ver=2020-03-13-072730-880. Pursuant to that declaration, the Governor has issued multiple executive directives seeking to slow the spread of the virus to the greatest extent possible.

53.     The Governor has paid special attention to vulnerable groups that COVID-19 affects, including seniors and the medically vulnerable, people who rely particularly heavily on mail delivery to remain safe and healthy.

54.     Nearly 20 percent of Montanans are over age 65. Half of the state's population is 40 or older, making Montana the 9th oldest in the nation. Eric Dietrich & Brad Tyer, *How, where, and why Montana became the grayest state in the West*, Billings Gazette (March 12, 2020), https://billingsgazette.com/how-where-and-why-montana-became-the-grayest-state-in-the-west/article_2adc1cc8-eb2f-5e7e-a3f2-0f4a41f168da.html.

55.     The Postal Service provides an essential service by delivering mail that is critical to individuals' health and wellbeing, including, for example, packages containing household supplies and groceries enabling the medically vulnerable to avoid in-person visits to stores, medical prescriptions, Social Security payments, and stimulus checks. Amidst the COVID-19 pandemic, postal employees have continued to deliver mail to meet the essential needs of Montanans and their neighbors across the country.

56.     Pursuant to emergency powers provided in the Montana Constitution

and state statute, and in response to the emergency, Governor Bullock provided Montana counties with the option to conduct mail ballot elections and expand access to early voting. The great majority of Montana counties, representing more than 75% of the state's eligible voting population, have opted to do so thus relying on the timely and reliable delivery of the mail. In June, Montana's primary was conducted entirely by mail and the Secretary of State has reported that nearly 55% of the registered voters cast votes in that election.

57.     Although the Postal Service claims it has stopped removing additional mail drop boxes across Montana after letter carriers sounded the alarm, the range of changes already instituted unlawfully by DeJoy have detrimentally affected timely, reliable mail service in Montana. *See* Tom Lutey & Gwen Florio, *Postal Service stops Montana mail changes amid objections*, Billings Gazette (Aug. 15, 2020), https://billingsgazette.com/news/state-and-regional/govt-and-politics/postal-service-stops-montana-mail-changes-amid-objections/article_929260ce-28b3-570e-9fda-7cf1640f983b.html.

## F.  Rural communities in Montana rely on timely, regular mail delivery

58.     In Montana, the essential nature of the Postal Service's work is especially acute because the State is home to more than a million people who live in diverse communities across 93 million acres of land.

59.     Montana is the fourth largest U.S. state by area and nearly 45 percent of

Montanans live in rural areas.

60.    Seven reservations encompass more than 2 million acres of land in Montana. Native American communities have been especially affected by the COVID-19 crisis. And several tribes in Montana have chosen to implement protective measures that are stricter than the statewide measures, maintaining stay-at-home orders and keeping businesses closed to protect tribal members. Kathleen McLaughlin, *Montana's Tribal Nations Preserve COVID Restrictions to Preserve Their Cultures*, Kaiser Health News (June 5, 2020), https://khn.org/news/montanas-tribal-nations-preserve-covid-restrictions-to-preserve-their-cultures/.

61.    "Native Americans account for 6.6% of Montana's population, yet they comprise 17% of the state's total COVID-19 cases and 32% of deaths from the virus," according to a July 24, 2020 report. Nora Mabie, *Native American tribes have been hit harder by COVID-19. Here's why.*, Great Falls Tribune (Aug. 17, 2020), https://www.greatfallstribune.com/story/news/2020/08/05/why-native-americans-impacted-harder-covid-19-montana-united-states/5573737002/.

62.    These disparities are the result of, among other challenges, underfunded health care resources, a dearth of affordable housing, and preexisting disparities in health conditions including diabetes, cancer, and heart disease, all of which can exacerbate COVID-19 symptoms. *Id.*

63.    About 60 million of Montana's 93 million acres are considered

agricultural land. The production of wheat, barley, and cattle dominate Montana's agriculture, typically accounting for about 80 percent of total farm and ranch cash receipts. Mont. Dep't of Environmental Quality, *Climate Change & Agriculture: Land Use*, https://deq.mt.gov/Energy/climatechange/commerce/agriculture/landuse (last accessed Aug. 27, 2020).

64.     Slowdowns in mail delivery harm communities across Montana, but particularly affect older Montanans, people living in rural farming and ranching communities, and those living on tribal land.

## CLAIMS FOR RELIEF

### COUNT ONE:
### Writ of Mandamus

65.     Governor Bullock incorporates all previously made allegations in this Complaint by reference as if set forth herein.

66.     The Postal Service has a non-discretionary duty to seek an advisory opinion from the Postal regulatory Commission "prior to" implementing any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide bases." 39 U.S.C. § 3661(b) ("When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."); *see*

*also* 39 C.F.R. § 3020.112 ("The request shall be filed not less than 90 days before the proposed effective date of the change in the nature of postal services involved.").

67.     Defendants' recent policy changes, which DeJoy has described as "transformative," have created a "change in the nature of postal services . . . nationwide" by significantly delaying and frustrating mail delivering. *See Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262–63 (5th Cir. 1975) (a "change in the nature of postal services" under 39 U.S.C. § 3661(b) occurs when "the manner in which postal services available to the user will be altered").

68.     Defendants have not performed their non-discretionary duty to seek an advisory opinion from the Postal Regulatory Commission "prior to" implementing these policy changes.

69.     As a result of that failure to perform a mandatory duty, Governor Bullock has been deprived of his statutory right to notice and comment on the Postal Service's nationwide service changes. *See* 39 U.S.C. § 3661(c) ("The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."). This injury is particularly grave under the circumstances here because the policy changes Defendants have made appear specifically aimed at interfering with the pace of mail delivery, including Montanan's

ability to reliably use the Postal Service to cast mail-in ballots in the upcoming November 3, 2020 general election.

70.     Absent mandamus, Governor Bullock will have no adequate remedy for Defendants' failure to comply with 39 U.S.C. § 3661. While a litigant could ordinarily seek review of the Postal Service's failure to comply with Section 3661 by filing a complaint with the Postal Regulatory Commission, it is not possible for the Postal Regulatory Commission to act quickly enough to alleviate Governor Bullock's concerns of harms to the state agencies he oversees and to Montanans. As a result, absent mandamus, Governor Bullock will suffer irreparable harm.

71.     For these reasons, Governor Bullock is entitled to a writ of mandamus under 28 U.S.C. § 1361 directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion" on the "transformative" policy changes and enjoining Defendants from implementing these changes until they have fully complied with the procedural requirements set forth in 39 U.S.C. § 3661.

**COUNT TWO:**
**Action Not in Accordance with Statutorily Required Procedure**

72.     Governor Bullock incorporates all previously made allegations in this Complaint by reference as if set forth herein.

73.     Governor Bullock has a non-statutory right of action to obtain relief from this Court enjoining and declaring unlawful official action that is contrary to law.

74.     Governor Bullock may seek from this Court a writ of mandamus to

compel the performance of a clear duty owed to him for which there is no other adequate available remedy.

75.     DeJoy and the Postal Service have, through the series of changes discussed above, implemented changes in the nature of postal services that will affect mail delivery services both in Montana and on a substantially nationwide basis without following the procedures required by 39 U.S.C. § 3661.

76.     39 U.S.C. § 3661 requires that the Postal Regulatory Commission, prior to issuing an opinion on a proposed change, provide an opportunity for hearing on the record under Sections 556 and 557 of Title 5 of the U.S. Code (the Administrative Procedure Act); the hearing must include input from the Postal Service, users of the mail—including the Governor and the people of the State of Montana—and an officer of the Commission who shall be required to represent the interests of the general public. 39 U.S.C. § 3661(c). The opinion of the Commission must made be in writing and must include a certification by each Commissioner agreeing with the opinion. *Id.*

77.     DeJoy and the Postal Service owe a clear and certain duty, free from doubt, to Governor Bullock to comply with the procedure set forth in 39 U.S.C. § 3661 when proposing changes in the nature of postal services that may affect mail delivery services on a substantially nationwide basis and in Montana.

78.     Failure to follow the procedures set forth in 39 U.S.C. § 3661 denies Governor Bullock, the Montana state government, the people of Montana, and all

other postal users in the United States their fundamental right to a hearing on Defendants' proposed changes. It further deprives Governor Bullock, all Montanans, and all other postal users of the expertise of the bipartisan five-member Postal Regulatory Commission.

79.     The Postal Service's failure to follow required procedures has deprived the Governor of his opportunity to comment on the changes in postal service, and has dangerously impacted the timely delivery of mail to Montanans.

80.     The injury to the Governor's opportunity to comment, and the detrimental impact on Montana state government operations and all Montanans, is both immediate and ongoing.

81.     The administrative remedies provided in 39 U.S.C. §§ 3662 and 3663 are inadequate to alleviate the immediate injury to Governor Bullock and Montanans who rely on the mail for essential governmental and nongovernmental services, and the injury to Montana voters whose mail-in ballots will be sent out in just 31 days.

82.     Governor Bullock has no adequate or available administrative remedy; and any effort to obtain an administrative remedy would be futile.

83.     Governor Bullock will suffer irreparable injury if the changes are not declared unlawful; he has no other adequate remedy at law.

84.     The public interest favors entry of a declaration that the changes are unlawful and invalid because they were issued and adopted without observance of the

mandatory procedures required by 39 U.S.C. § 3661.

**COUNT THREE:**
*Ultra Vires* Action

85.     Governor Bullock incorporates all previously made allegations in this Complaint by reference as if set forth herein.

86.     Governor Bullock has a non-statutory right of action to obtain equitable relief from this Court enjoining or declaring unlawful official actions of federal officers or agencies, including the Postmaster General and the Postal Service, that exceed their constitutional or statutory authority.

87.     The Postal Service is statutorily required to provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities," and "[t]he costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." 39 U.S.C § 101(a). In addition, "[i]n determining all policies for postal services," the Postal Service is statutorily mandated to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C § 101(e).

88.     Furthermore, "[i]t shall be the responsibility of the Postal Service" to "(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide; (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and (3) to establish and maintain postal facilities of

such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." 39 U.S.C. § 403(b).

89.     DeJoy and the Postal Service have taken actions that fall outside their enumerated powers under 39 U.S.C. § 401 and § 404 and have violated the Postal Service's duties under 39 U.S.C. § 101 and § 403.

90.     By taking these actions, DeJoy and the Postal Service have acted *ultra vires* and exceeded the authority delegated to them under the Postal Service statute.

91.     These actions also exceed the statutory and constitutional powers allocated to the Postal Service and to DeJoy as the Postmaster General because they are arbitrary and capricious. To take these actions, DeJoy and the Postal Service relied on factors that Congress did not intend for them to consider, failed to consider important aspects of the issues facing the Postal Service, and offered no explanation for their decisions consistent with the evidence before them.

92.     As a result, DeJoy and the Postal Service have acted *ultra vires* by taking actions designed to delay and obstruct the delivery of essential mail, including medical prescriptions, payments, application materials for jobs and educational opportunities, important supplies for farming and ranching, and vital State government communications—not to mention how delay will obviously interfere with Montanans' ability to vote in the upcoming November election in the midst of a global pandemic.

## PRAYER FOR RELIEF

For these reasons, plaintiffs respectfully request that this Court:

a. Declare unlawful DeJoy's Postal Service policy changes described herein for depriving Montanans and others of timely mail delivery and for detrimentally impeding the Governor's emergency response to the COVID-19 pandemic and the operations of Montana state government;

b. Declare unlawful the actions described herein for being taken without observance of procedures required by law because they constitute changes in the nature of the postal service that will affect service in Montana and likely on a substantially nationwide basis, such that they may not be implemented prior to their submission to the Postal Regulatory Commission for public hearings pursuant to 39 U.S.C. § 3661(b);

c. Declaring *ultra vires* the actions described herein because they exceed the Postmaster General's statutory and regulatory authority;

d. Granting mandamus relief compelling DeJoy and the Postal Service to comply with the scope of the enumerated powers and duties set forth in 39 U.S.C. §§ 401–404 and 3661–3663.

e. Preliminarily and permanently enjoining DeJoy and the Postal Service and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction or control, from

30

implementing and/or continuing to implement any of the actions described herein or of a kind with such actions;

      f.     Directing DeJoy and the Postal Service to immediately act to reverse any of the actions described herein and declared unlawful, including those which have been previously implemented in whole or in part by DeJoy or the Postal Service;

      g.     Award Governor Bullock his costs, attorneys' fees, and other disbursements for this action; and

      h.     Grant any other relief this Court deems appropriate.

Dated:      September 8, 2020          Respectfully submitted,

/s/ *Raphael Graybill*
RAPHAEL GRAYBILL
Chief Legal Counsel
RYLEE SOMMERS-FLANAGAN
Deputy Legal Counsel
Office of the Governor
PO Box 200801
Helena, MT 59620-0801
Phone: (406) 444-3179
Fax: (406) 444-5529
*raphael.graybill@mt.gov*
*rylee.sommers-flanagan@mt.gov*

*Attorneys for Plaintiff Steve Bullock*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7.1 of the Rules of Procedure of the United States District Court for the District of Montana, I certify the following concerning the Complaint:

1. the document is double spaced except for footnotes and quoted and indented material;

2. the document is proportionally spaced, using Baskerville, 14 point font; and

3. the document contains 6,847 words as calculated by Microsoft Word.

Dated:          September 8, 2020

/s/ *Raphael Graybill*
Raphael Graybill