# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| STEVE BULLOCK, in his official capacity as Governor of Montana, <br><br>     Plaintiff, <br><br>   vs. <br><br> UNITED STATES POSTAL SERVICE, *et al.*, <br><br>     Defendants. | Case No. 4:20-cv-00079-BMM <br><br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

JEFFREY B. CLARK
Acting Assistant Attorney General
ERIC R. WOMACK
Assistant Branch Director
Federal Programs Branch
JOSEPH E. BORSON
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
JOHN ROBINSON (D.C. Bar No. 1044072)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, D.C. 20005
(202) 514-1944
john.robinson@usdoj.gov

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................4

I.      The United States Postal Service................................................4

II.     The Challenged Policies ...........................................................4

      A.      Overtime ........................................................................5

      B.      The Alleged "Leave Mail Behind" Policy ............................6

      C.      Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines................................................................9

      D.      Alleged Reduction in Operating Hours...............................11

      E.      USPS's Handling of Election Mail ....................................11

      F.      USPS's Compliance with Nationwide Injunctions Entered in Washington and New York................................................14

LEGAL STANDARD.......................................................................16

ARGUMENT ...................................................................................17

I.      PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS............18

      A.      Plaintiff Lacks Article III Standing....................................18

      B.      Plaintiff Is Not Likely to Succeed on the Merits ................20

            1.      District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661...................21

            2.      The *Ultra Vires Doctrine* Does Not Provide an Avenue for Judicial Review Here .........................................24

3.    Mandamus is Unavailable Because Plaintiff Has an
      Adequate Remedy and Because His Right to Relief is
      Not Clear and Indisputable ........................................................31

4.    Plaintiff Is Not Likely to Succeed on the Claim That
      Defendants Actions Are "Not in Accordance With
      Statutorily Required Procedure" ...............................................33

II.   PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM .........33

III.  THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY
      RELIEF ...................................................................................................35

CONCLUSION ......................................................................................................36

iii

# TABLE OF AUTHORITIES

## CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
  458 U.S. 592 (1982)....................................................................................19

*Allee v. Medrano,*
  416 U.S. 802 (1974)....................................................................................20

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991)......................................................................................25

*Bovard v. U.S. Post Office*,
  47 F.3d 1178 (10th Cir. 1995) ....................................................................22

*Buchanan v. U.S. Postal Serv.*,
  508 F.2d 259 (5th Cir. 1975) .................................................................. 25, 26

*Caribbean Marine Servs. Co. v. Baldridge*,
  844 F.2d 668 (9th Cir. 1988) ......................................................................33

*Cheney v. U.S. Dist. Ct.*,
  542 U.S. 367 (2004).....................................................................................31

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)......................................................................................20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).....................................................................................18

*Eagle Tr. Fund v. U.S. Postal Serv.*,
  365 F. Supp. 3d 57 (D.D.C. 2019)...............................................................30

*Foster v. Pitney Bowes Corp.*,
  549 F. App'x 982 (Fed. Cir. 2013) ...............................................................22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010).....................................................................................23

*Hironymous v. Bowen*,
  800 F.2d 888 (9th Cir. 1986) .......................................................................32

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
  548 F.3d 110 (D.C. Cir. 2008)...............................................................23

*In re United States*,
  791 F.3d 945 (9th Cir. 2015) ...............................................................31

*Key Med. Supply, Inc. v. Burwell*,
  764 F.3d 955 (8th Cir. 2014) ........................................................ 30, 31

*LeMay v. U.S. Postal Serv.*,
  450 F.3d 797 (8th Cir. 2006) ........................................................ 21, 22

*Marciano v. Shulman*,
  795 F. Supp. 2d 35 (D.D.C. 2011).........................................................31

*McDermott v. Potter*,
  No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009) ..............22

*Mittleman v. Postal Regul. Comm'n*,
  757 F.3d 300 (D.C. Cir. 2014)...................................................... 24, 30

*Moreno v. Bureau of Citizenship & Immigration Servs.*,
  185 F. App'x 688 (9th Cir. 2006) .......................................................32

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
  437 F.3d 1256 (D.C. Cir. 2006).............................................................25

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020)....................25

*Nken v. Holder*,
  556 U.S. 418 (2009)...............................................................................17

*Nyunt v. Broad. Bd. of, Govs.*,
  589 F.3d 445 (D.C. Cir. 2009) .......................................................24

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
  762 F.2d 1374 (9th Cir. 1985) ...........................................................33

*Pep-Wku, LLC v. U.S. Postal Serv.*,
  No. 1:20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020)............22

*Plumbing v. Belodedov*,
   No. 2:17-cv-02545-TLN-AC, 2018 WL 888965 (E.D. Ca. Feb. 14, 2018) ........17

*Rodriguez v. Hemit*,
   No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) .................22

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   134 F. Supp. 3d 365 (D.D.C. 2015) ....................................................................23

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .......................................................................................18

*Striley v. U.S. Postal Serv.*,
   No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ................23

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................... 18, 33

*Telecomms Res. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ..............................................................................23

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (D.C. Cir. 1984) ............................................................................21

*Washington v. Trump*,
   2017 WL 4857088 (W.D. Wash. Oct. 27, 2017) .................................................34

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*,
   379 U.S. 411 (1995) ............................................................................................23

*Wilson v. U.S. Postal Serv.*,
   441 F. Supp. 803 (C.D. Cal. 1977) .....................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................16

**STATUTES**

39 U.S.C. § 101 ........................................................................................... 29, 30, 34

39 U.S.C. § 409 ..................................................................................................21

39 U.S.C. § 3661 ...................................................................................... *passim*

39 U.S.C. § 3662 ................................................................................ 21, 22, 23

39 U.S.C. § 3663 .............................................................................................22

**RULES**

Fed. R. Civ. P. 65 ...........................................................................................34

**OTHER AUTHORITIES**

Congressional Briefing (Aug. 31, 2020),
    https://about.usps.com/newsroom/global/pdf/0831-congressional-service-
    briefing.pdf ..............................................................................................8

Service Performance Rebounds at Postal Service (Aug. 31, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0831-service-
    performance-
    rebounds-at-postal-service.htm ................................................................8

USPS Service Performance Continues Upward Trend (Sept. 10, 2020),
    https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-
    performance-continues-upward-trend.htm ...............................................8

## INTRODUCTION

This case is not about whether the United States Postal Service ("USPS") will be able to meet the burdens imposed by individuals who intend to vote by mail in the November 2020 election (the "Election"). Just as it has in past elections, USPS has taken, and will continue to take, a number of efforts to ensure that ballots move quickly and efficiently through the mail. Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that USPS has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID pandemic. Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure—until after the Election.

Moreover, Plaintiff's motion has now been overtaken by events. On September 17, 2020, the U.S. District Court for the Eastern District of Washington issued a nationwide preliminary injunction enjoining the Postal Service from taking the same actions that Plaintiff challenges here. *See State of Washington v. Trump*, No. 20-cv-03127 (E.D. Wash. Sept. 17, 2020). The U.S. District Court for the Southern District of New York also granted plaintiffs' motion for a preliminary

injunction against USPS on September 21, 2020. *Jones v. U.S. Postal Serv.*, No. 20-cv-06516 (S.D.N.Y. Sept. 21, 2020). On September 21, 2020, USPS put in place detailed operational guidance in response to the injunction entered in the Eastern District of Washington that further addressed the policies that Plaintiff challenges here. And on September 25, 2020, USPS issued instructions detailing additional resources that would be made available to support the expeditious handling of Election Mail beginning on October 1, 2020. In light of these recent events, there is no reason for this Court to enter yet another injunction barring USPS from taking actions that it has already suspended, and which Plaintiff has made no attempt to justify in light of the changes made by USPS. Plaintiff's motion should be denied for multiple, independent reasons.

First, Plaintiff cannot show a likelihood of success because Plaintiff lacks Article III standing. The alleged purported injuries either involve purely procedural injuries insufficient to justify standing under the Supreme Court's *Summers* decision; attempts to assert *parens patriae* standing on behalf of Montana's citizens that is insufficient under the Supreme Court's *Mellon* decision; or speculation about future injury caused by future mail delays that is insufficient under the Supreme Court's *Clapper* decision. And because USPS has now issued clarifying instructions addressing all of the purported policies that Plaintiff challenges in the complaint, Plaintiff cannot assert future or ongoing injury from prior actions that have since been superseded.

Even if Plaintiff had standing, the Court still lacks jurisdiction over Plaintiff's statutory claim. Plaintiff asserts that the Postal Service failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission. But Congress has explicitly channeled those claims away from the district court, and toward the Postal Regulatory Commission, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit. Decades of precedent confirm that district courts have no jurisdiction over these claims.

Although Plaintiff attempts to turn to *ultra vires* jurisdiction to overcome this clear statutory bar, such jurisdiction is unavailable here for two reasons. First, *ultra vires* review is unavailable where there is a path for judicial review, and because here there is, Plaintiff cannot invoke this doctrine. Second, relief under the *ultra vires* doctrine requires a clear violation of an explicit statutory command, implicating the agency's jurisdiction to take such action. But the statute Plaintiff relies upon applies only to certain major changes, and here there never were any "changes" of service at the national level, and to the extent there were any changes at all, those changes have since been suspended. Nor, largely for the same reasons, is mandamus appropriate.

Furthermore, Plaintiff cannot establish the other prerequisites for a preliminary injunction. Plaintiff's purported injuries are not irreparable, but rather consist of speculative and unjustified concerns based on alleged *past* practices that have now been suspended. And finally, the balance of the equities and the public interest do not support this Court effectively issuing an advisory opinion ordering USPS to suspend policies that have already been suspended.

## BACKGROUND

### I.  The United States Postal Service

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. It is one of the nation's largest and most complex business operations. USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a single day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

### II.  The Challenged Policies

Plaintiff's Complaint challenges six purported "transformative" changes to USPS policies. These include "(i) eliminating overtime pay for certain postal workers; (ii) instructing carriers to leave mail behind, rather than deliver it, in certain circumstances; (iii) decommissioning letter sorting machines; (iv) removing

mailboxes; (v) reducing operating hours; and (vi) changing how election mail is classified and charged." *See* PI Br. at 3.

As explained below, many of the activities that Plaintiff challenges here and in these other cases (such as an alleged elimination of overtime) were never in fact USPS policies. And as to those that were, almost all of the complained-of activities were longstanding practices of USPS. In any event, USPS has now issued clarifying instructions addressing all of the purported policies challenged in the Complaint, rendering moot any dispute over whether those policies previously existed.

## A.    Overtime

USPS's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took office. *See* Declaration of Angela Curtis ("Curtis Dec.") ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4.[1] In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See, e.g.*, Ex. 2 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing

---

[1] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones*, No. 1:20-cv-06516 (S.D.N.Y.).

(Aug. 24, 2020)) 14. Further, after the court in *Washington* issued a nationwide injunction on September 17, 2020, USPS issued instructions clarifying that Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day. *See* Ex. 3 Clarifying Operational Instructions (Sept. 21, 2020) ("Instructions") ¶ 1.

### B.     The Alleged "Leave Mail Behind" Policy

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules. Declaration of Robert Cintron ("Cintron Dec.") ¶¶ 1, 11-13, 21. On June 16, 2020, the USPS Office of Inspector General (OIG) published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. *See* Ex. 7 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections) at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 4 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.*

After Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed his initiative to improve compliance with USPS's long-established delivery schedules with the Postmaster General and other Postal executives. Cintron Dec. ¶¶ 22-23.

Soon after joining USPS, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. Cintron Dec. ¶ 23. Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25.[2]

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance. *Id.*

_____

[2] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1. This memo was locally prepared by an Area Vice President without approval by USPS Headquarters. *Id.* The memo does not represent official USPS policy, in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules. *Id.* As discussed in the Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec"), the July 10 memorandum drew from a teleconference discussion conducted between regional and Headquarters officials, but "[s]tarting on July 11, 2020, in light of some confusion in the field about the scope of USPS policy, members of Headquarters begin to issue clarifications of USPS policy, including with [Area Vice Presidents] making clear that certain statements in the July 10, 2020 [memorandum] were not accurate statements of USPS policy." *Id.* ¶¶ 3-4. This included clarifying the circumstances where extra trips were permissible. *Id.* ¶ 4. "Late and extra trips are not and were not banned, rather they continued (albeit at a reduced level) both in July and today." *Id.*

¶ 26. However, after USPS addressed the decline, it observed steady improvements in service performance. *Id.* ¶ 27; *see* Curtis Dec. ¶ 30. On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules. In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing"); Cintron Dec. ¶ 27. Furthermore, in the last two months, there has been a sharp decrease in late and extra trips. *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve. *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

After the *Washington* court issued the nationwide injunction, USPS issued instructions further clarifying that the "Postmaster General has not banned the use

of late or extra trips; when operationally required, late or extra trips are permitted." Instructions ¶ 5. The Instructions expressly provide that mail should not "be left behind," and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments." *Id.* The Instructions "supersede any previous guidance provided no these specific topics that could be seen as conflicting with these Instructions, whether from Headquarters or the field." *Id.* ¶ 1.

## C.   Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual. *Id.* ¶ 5. Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action. *Id.* ¶¶ 5, 8. For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas. *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal. *Id.* ¶ 6. USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to the removal of these boxes. *Id.* ¶¶ 10,

9

19. Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction. *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Cintron Dec. ¶ 5. Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail. DeChambeau Dec. ¶ 13.

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 5 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15. Additionally, on September 21, 2020, USPS issued instructions clarifying that mail processing equipment and blue collection boxes will not be removed until after the November 2020 elections (except where collection boxes are damaged or temporarily removed for public safety). *See* Instruction ¶¶ 4, 6. With respect to mail processing, as of September 18, 2020, Headquarters has approved all requests to reconnect machines directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary. Instructions ¶ 6.

### D.    Alleged Reduction in Operating Hours

On August 18, 2020, Postmaster General DeJoy publicly committed to suspending changes to retail hours. *See* Ex. 5. Further, on September 21, 2020, USPS issued instructions clarifying that retail hours will not be adjusted prior to the Election, absent temporary changes due to unforeseen circumstances beyond the Postal Service's control, such as natural disasters. Instructions ¶ 3.

### E.    USPS's Handling of Election Mail

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications). *Id.* USPS regards Election Mail as having special importance.

USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election. By its analysis, even if every registered voter in the United States used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season. *Id.* ¶ 43; DeChambeau Dec. ¶ 23. Indeed, USPS projects that only two to five percent of the total mail

11

volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. USPS has been planning for the November Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. State and local election officials may choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4. Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 6 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R-20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 1. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 7 at 18.

Moreover, for many years, USPS has taken special measures for handling Election Mail. First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. When a mail bin

identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. Glass Dec. ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots. *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. *Id.* ¶¶ 1, 27.

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that,

starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 5 at 1-2. These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29.

Finally, on September 21, 2020, USPS issued instructions clarifying that it will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. Instructions ¶ 7. This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks. *Id.*

### F. USPS's Compliance with Nationwide Injunctions Entered in Washington and New York

On September 17, 2020, the U.S. District Court for the Eastern District of Washington entered a nationwide Preliminary Injunction enjoining the Postal Service from taking the same actions that Plaintiff challenges here. The U.S. District Court for the Southern District of New York also granted plaintiffs'

14

motion for a preliminary injunction against USPS on September 21, 2020. Because the *Washington* injunction is nationwide in scope, it applies to any USPS activities that may affect the State of Montana, its state agencies, and citizens.[3]

On September 18, 2020, USPS notified senior managers about the issuance of the *Washington* injunction. And, as noted, on September 21, 2020, USPS put in place detailed operational guidance regarding how to comply with this injunction. Among other things, the Instructions provide:

- **Overtime:** Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day. Overtime use has not been banned, nor have any caps been placed on overtime hours. Instructions ¶ 1.

- **The Alleged "Leave Mail Behind" Policy:** "The Postmaster General has not banned the use of late or extra trips, when operationally required, extra or late trips are permitted," mail "should not" be left behind; and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments." Instructions ¶ 5.

- **Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines:** Mail processing equipment and blue collection boxes will not be removed until after the November 2020 elections (except where collection boxes are damaged or temporarily removed for public safety). *See* Instruction ¶¶ 4, 6. With respect to mail processing, as of September 18, 2020, Headquarters has approved all requests to reconnect machines

---

[3] USPS is still evaluating whether to appeal the injunctions entered in *Washington* and *Jones*, and has moved to clarify certain aspects of the *Washington* injunction. But because USPS has already issued clarifying instructions and other guidance to employees in response to the *Washington* injunction, nothing could be gained from this Court issuing yet another nationwide injunction enjoining the same policies enjoined by the *Washington* court. Indeed, because the Washington injunction was entered in the Ninth Circuit, any decision on appeal would be binding on this Court as well.

directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary. Instructions ¶ 6.

- **Alleged Reduction in Operating Hours:** Retail hours will not be adjusted prior to the Election, absent temporary changes due to unforeseen circumstances beyond the Postal Service's control, such as natural disasters. Instructions ¶ 3.

- **Election Mail:** USPS will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. Instructions ¶ 7. This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks. *Id.*

On September 24, 2020, USPS deployed a "Mandatory Stand-Up Talk" that summarizes these Instructions to all employees. *See* Ex. 18. And on September 25, 2020, USPS issued instructions detailing additional resources that would be available to support the expeditious handling of Election Mail beginning October 1, 2020. *See* Ex. 19.

## LEGAL STANDARD

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Moreover, Plaintiff seeks an order requiring the Postal Service to take particular actions, rather than seeking merely to preserve the status quo. This motion accordingly seeks a mandatory injunction, and "[t]he Ninth Circuit has adopted a heightened standard with respect to mandatory injunctions." *Plumbing v. Belodedov*, No. 2:17-cv-02545-TLN-AC, 2018 WL 888965, at *3 (E.D. Ca. Feb. 14, 2018). "A district court should deny a mandatory injunction 'unless the facts and law clearly favor the moving party.'" *Id.*

## ARGUMENT

Plaintiff has not established the requirements for the extraordinary relief Plaintiff seeks in this motion. First, Plaintiff is not likely to succeed on the merits. Plaintiff cannot show Article III standing based on the injuries alleged in the Complaint, nor can Plaintiff litigate a claim that Congress has mandated must be directed to the PRC and then, if necessary, to the D.C. Circuit. If the Court were to decide, contrary to the overwhelming majority of precedent, that the claim is nonetheless reviewable here, Plaintiff's claim would still fail to meet the high standards required for an *ultra vires* or mandamus claim in this Circuit. And relief is

still not appropriate, because Plaintiff is seeking to enjoin changes that have either

have not occurred or are no longer occurring.

## I.   PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiff Lacks Article III Standing

At the outset, Plaintiff cannot succeed claim because Plaintiff cannot show

Article III standing. To establish standing, Plaintiff "must have (1) suffered an injury

in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3)

that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*,

136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the

"threatened injury must be certainly impending to constitute injury in fact;"

"[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 409 (2013). A "theory of standing, which relies on a highly

attenuated chain of possibilities, does not satisfy" this requirement. *Id.* at 410. "The

plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing

these elements," and therefore "must clearly . . . allege facts demonstrating each

element." *Spokeo*, 136 S. Ct. at 1547.

*First*, Plaintiff asserts injury in the form of a (purported) denial of an

opportunity to comment on purported changes made by the Postal Service pursuant

to 39 U.S.C. § 3661. PI Br. at 21-22. "But deprivation of [such] a procedural right

without some concrete interest that is affected by the deprivation—a procedural right

*in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island*

*Inst.*, 555 U.S. 488, 496 (2009). Plaintiff cannot invoke this Court's jurisdiction

based on a procedural injury without a corresponding harm to substantive interests.

*Second*, to the extent Plaintiff alleges standing based on purported injury to Montana's citizens, *i.e.*, as *parens patriae*, *see* PI Br. at 22-25, it is black letter law that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982).

*Third*, Plaintiff cannot show that USPS's purported policy changes caused harm in the form of delayed mail. Plaintiff produces no evidence showing that the removal of excess mail processing machines would cause any delays in the mail. Indeed, even factoring in the now-removed machines, USPS's mail processing machines are still only being utilized at a sixty-five percent rate when mail volume is at its highest, *see* Declaration of Michael L. Barber ("Barber Dec.") ¶ 6, which means there is ample extra capacity. Nor can Plaintiff show that the Postal Service's focus on mitigating unnecessary extra or late causes a delay in processing and delivering the mail of such magnitude as to affect Montana's sovereign or proprietary interests. And even if those efforts were the cause of a general mail delay back in July, given USPS's recent efforts and improvements, *see* Cintron Dec. ¶¶ 26-27, Plaintiff cannot show that there is a continued threat of injury caused by the Postal Service's purported activities.

This is especially so in light of USPS's September 21, 2020 clarifying instructions in response to the *Washington* court's nationwide injunction. Those instructions address all of the purported policies that Plaintiff challenges in the

Complaint. As a result, even if Plaintiff could have asserted injury at some point in time, Plaintiff certainly cannot assert future or ongoing injury, particularly one sufficient to establish entitlement to the extraordinary relief Plaintiff seeks. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108-09 (1983).[4]

### B.   Plaintiff Is Not Likely to Succeed on the Merits

Even if Plaintiff did have standing, the underlying claims lack merit, and accordingly Plaintiff would not be entitled to injunctive relief. Plaintiff's central claim in this lawsuit is that the Postal Service has failed to comply with the requirement to seek an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661(b) before enacting certain purported operational changes. PI Br. at 5-9. Section 3661(b) requires that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b). Plaintiff's § 3661 argument fails for multiple reasons.

---

[4] Because USPS has already suspended the purported policies that Plaintiff challenges, this Court also lacks jurisdiction because Plaintiff's claims are moot. The "voluntary cessation" exception to mootness does not apply because if the Court were to deny Plaintiff's motion, USPS would not "be free to return to [its] old ways," *Allee v.* Medrano, 416 U.S. 802, 810 (1974), as it would still be subject to the *Washington* injunction.

20

### 1. District Courts Lack Subject-Matter Jurisdiction Over Complaints Regarding 39 U.S.C. § 3661

As a threshold matter, Congress has precluded district court jurisdiction over Plaintiff's section 3661 claim. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title." 39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section 3662). This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction over complaints regarding the Postal Service's compliance with certain statutory requirements – including section 3661 – in the PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [*i.e.*, Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance." *Id.* § 3662(c). If that

21

person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663.

Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions specifically identified in section 3662 – and as discussed above, that includes a claim that the Postal Service is not complying with section 3661. Numerous courts of appeals have so held. *See, e.g., Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In this case, Congress removed the district courts' jurisdiction over claims regarding postal rates and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's remedy for unsatisfactory service [which was identified in section 3662] lies with the Postal Rate Commission. . . . Accordingly, the district court was without jurisdiction to review this claim.").

These courts of appeals have been joined by "countless decisions" of lower courts. *Pep-Wku, LLC v. U.S. Postal Serv.*, No. 1:20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020); *see, e.g., McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018);

*Striley v. U.S. Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015).

This overwhelming line of precedent has developed for good reason. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems' those procedures 'are to be exclusive.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)). "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. Under such circumstances, this court lacks subject matter jurisdiction over this claim.

23

**2.** **The *Ultra Vires Doctrine* Does Not Provide an Avenue for Judicial Review Here**

Plaintiff fails to acknowledge Section 3662's channeling of review to the PRC and then to the D.C. Circuit. Instead, Plaintiff seeks review under this Court's very limited *ultra vires* review doctrine. But Plaintiff cannot satisfy *ultra vires* review, for two reasons – first, *ultra vires* review is available *only* where there is no other potential remedy, and here the statute provides for the filing of a complaint to the PRC and then the D.C. Circuit. And second, *ultra vires* review is available only if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority. There is no such error here – indeed, the vast majority of the "changes" of which Plaintiff complains did not exist.

For claims – unlike here – where there is no other remedy, some courts have found "non-statutory review' available for certain Postal Service decisions. *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014). Such review, however, "is quite narrow," *Mittleman*, 757 F.3d at 307, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). In order to justify relief under the *ultra vires* doctrine "a plaintiff must show, *first* that the agency has acted in excess of its delegated powers and contrary to a specific prohibition, and, *second*, that barring review by the district court would wholly deprive the party of a

meaningful and adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006). With respect to the first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory provision. A statutory provision is 'clear and mandatory' when it has only one unambiguous interpretation." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, No. 18-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020).

Plaintiff's claim fails each requirement for *ultra vires* review. Most obviously, Plaintiff fails at the second condition: Plaintiff has a "meaningful and adequate means of vindicating [his] statutory rights," *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) – Plaintiff can file a complaint to the Postal Regulatory Commission, with judicial review in the D.C. Circuit if Plaintiff remains unsatisfied. Plaintiff's failure to even attempt to pursue the remedy provided by Congress is fatal to his claim.

Plaintiff's claim also fails under the first prong of the *ultra vires* analysis, because Plaintiff cannot show that the Postal Service has unequivocally violated sections 3661(b) or 101. Section 3661(b) requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The leading case interpreting

this statute is *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir. 1975). There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions." *Id.* at 262. Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.' This implies that a quantitative determination is necessary." *Id.* at 262. In other words, "[t]here must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661." *Id.* "Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." *Id*. at 262-63. "Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Id.* at 263. In drawing these lines, courts have made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like transferring mail processing facilities and maintaining mail trucks falling into the former category. *See, e.g.*, *Wilson v. U.S. Postal Serv.*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

None of the supposed "changes" that Plaintiff alleges meets these standards. USPS never made changes to its overtime policy (including banning overtime) or to its retail operating hours, nor has it closed or consolidated any mail processing facilities. *See* Curtis Dec. ¶¶ 12, 22-23, 32-35; Colin Dec. ¶ 3. It does not prohibit extra or late trips. *See* Cintron Dec. ¶¶ 23-24; Instructions ¶ 5. And to the extent Plaintiff alleges that late and extra trips *were* banned, that is certainly no longer the case, *see* Instructions ¶ 5, so prospective injunctive relief is not appropriate.

Nor did USPS make any "changes" with respect to its treatment of Election Mail. Plaintiff asserts that the Postal Service has made a decision "to no longer treat election mail as First-Class mail as a matter of course." PI Br. at 8. But, for starters, ballots returned by voters to their election officials, are, and have been First-Class Mail, and will continue to be handled as such (and in fact may receive delivery times even faster than most First-Class Mail). *See* Glass Dec. ¶ 18. And for Election Mail sent by the states to voters, state officials have always had the choice to determine "which class of mail to use to send mailings to voters." *Id.* ¶ 4. "If election officials chose to send out Election Mail to voters as Marketing Mail, there is no regulation or formal Postal Service policy providing that Election Mail (including ballots) entered as Marketing Mail be automatically upgraded to First-Class Mail, even if the mail bears the official Election Mail Logo." *Id.* ¶ 18.

This is not a new development, rather this has been the policy "for many years." *See* Defs.' Response to Pls.' First Set of Interrogatories ("Defs.' First Interrogs."), at 12 (Inter. 5), attached as Ex. J. to Pls.' PI Mot., *Washington*, No. 20-cv-03127 (E.D. Wash.). Moreover, the Postal Service has consistently recommended that "Boards of Election should use First-Class Mail postage rather than [Marketing Mail] when paying for the delivery of outbound absentee or vote by mail ballots." *See* Ex. 2 to Glass Dec. (2016 letter to state election officials).

In any event, USPS prioritizes the timely delivery of all Election mail, whether sent using Marketing Mail or First-Class Mail. The Postal Service has numerous policies to move Election Mail as expeditiously as possible, and has "several longstanding practices of prioritizing the expeditious processing and delivery of Election Mail, particularly ballots," including advancing Marketing Mail through processing when there is excess First-Class Mail processing capacity Glass Dec. ¶¶ 11, 20. As a result of these practices "the delivery timeframes for Election Mail entered as Marketing Mail often are comparable to those of Election Mail entered as First-Class Mail." *Id.* ¶ 21; *see also* Defs.' First Interrogs. at 16 (Inter. 6). And, following the nationwide injunction entered by the Washington court, USPS has issued clarifying instructions confirming that it will prioritize Election Mail. Instructions ¶ 7. In short, the Postal Service has – and continues to have – numerous

practices to move Election Mail as expeditiously as possible, with speeds often meeting or exceeding First Class delivery times. *See* Glass Dec. ¶¶ 21, 26.

Finally, Plaintiff complains about the removal of mail processing machines. This complaint fails the standards of *ultra vires* review for two reasons: it is not a change, and Plaintiff has not established that it had an effect on the mail. With respect to the former, the Postal Service has had a policy since at least 2015 of removing unnecessary mail processing machines, to free up resources as letter mail volumes decline (including to provide more resources for package processing, which has increased). *See* DeChambeau Dec. ¶¶ 7-14. This year is no different. *See id.* ¶ 21. Thus, the removal is not a "change," it is simply a continuation of a longstanding policy of efficiently managing the postal service's fixed assets; exactly the type of managerial decision committed to the Service's discretion. *See also* Instructions ¶ 6. Nor is there any evidence that such removals actually impacted the delivery time of the mail; to the contrary, even with the removal of that equipment, the Postal Service still has – on a busy day – 35% of excess machine capacity nationwide. *See* Barber Dec. ¶ 6. And if there were any doubt as to whether these "changes" are covered by Section 3661, that doubt would be sufficient basis to reject Plaintiffs' *ultra vires* claim, which requires that any error be clear and unambiguous.

Nor can Plaintiff bring an *ultra vires* challenge to the Postal Service's compliance with 39 U.S.C. § 101(e). *See* PI Br. at 15. That provision embodies the

29

postal policy that "[i]n determining all policies for postal service, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). But, pursuant to 39 U.S.C. § 410(a), "the Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman*, 757 F.3d at 305. "[W]here Congress has . . . acted to preclude even APA review, it is well established that no cause of action remains, much less some undefined 'traditional' equitable remedy." *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019). Moreover, "a claim that an agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers and contrary to a specific prohibition in [an] Act,[] not that an agency's authorized action was imprudent or that in validly exercising its judgment, the agency reached the wrong result.'" *Id.* at 67. It is the latter error that Plaintiff complains of here. Plaintiff is not questioning the Postal Service's general authority to make policy changes. Instead, Plaintiff is claiming that in making those policy changes, the Postal Service did not give "highest consideration" to the enumerated factors.

Further, section 101(e) is not even susceptible to *ultra vires* review. By its terms, it generally identifies certain factors that must play into the Postal Service's *decision-making process*; it imposes no restriction on the content of any policy that is implements. It is neither a grant of, nor a limitation on, the Postal Service's

30

authority but rather emphasizes the agency's wide discretion in setting policy. *See* 39 U.S.C. § 101(e). Such discretion cannot be squared with *ultra vires* review, which depends on a claim that there is no such doubt over the proper interpretation of a statute. *See, e.g.*, *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 963-64 (8th Cir. 2014) (noting, in the context of a "broad statutory authority," that plaintiff "attempts to identify clear violations of statutory authority," but has only "identified mere issues of statutory interpretation" insufficient for *ultra vires* review).

### 3. Mandamus is Unavailable Because Plaintiff Has an Adequate Remedy and Because His Right to Relief is Not Clear and Indisputable

Finally, and largely for the reasons discussed above, mandamus is unavailable. "Mandamus is a 'drastic and extraordinary' remedy 'reserved for really extraordinary cases.'" *In re United States*, 791 F.3d 945, 954 (9th Cir. 2015) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004)). "First, the party seeking issuance of the writ must have no other adequate means to obtain the relief he desires. Second, the petitioner's right to issuance of the writ must be clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* at 954-55 (quoting *Cheney*, 542 U.S. at 403). Plaintiff cannot satisfy these conditions.

With respect to the first prong, Plaintiff has an adequate remedy: a complaint to the PRC, followed by appeal to the D.C. Circuit. "[T]here is no jurisdiction to issue a writ of mandamus where a different statutory scheme provides the plaintiff with a remedy." *Marciano v. Shulman*, 795 F. Supp. 2d 35, 41 (D.D.C. 2011). Indeed, "it is clear that under the Mandamus Act exhaustion of remedies is a requirement for granting of the writ." *Hironymous v. Bowen*, 800 F.2d 888, 891 (9th Cir. 1986). Moreover, "the time require[d] to exhaust the administrative remedy [does not] make[] it an inadequate remedy." *Moreno v. Bureau of Citizenship & Immigration Servs.*, 185 F. App'x 688 (9th Cir. 2006). Again, Plaintiff has not even attempted to conform to Congress's statutory channel for review; much less to have completed that process.

But even were there no available remedy, Plaintiff still fails on the second mandamus prong: Plaintiff cannot show a "clear and indisputable" violation. This largely collapses into the same inquiry as ultra vires review, and Plaintiff's arguments fail for the same reason. In no way could it be deemed "clear and indisputable" that the limited actions the Postal Service has taken – almost none of which even constitute changes from existing policy and all of which have been suspended in light of the *Washington* injunction – meet this standard.

**4. Plaintiff Is Not Likely to Succeed on the Claim That Defendants Actions Are "Not in Accordance With Statutorily Required Procedure"**

In addition to Plaintiff's mandamus claim (Count One) and *ultra vires* claim (Count Three), Plaintiff also asserts a claim for "action not in accordance with statutorily required procedure" (Count Two). Count Two asserts that Plaintiff "may seek from this Court a writ of mandamus to compel the performance of a clear duty owed to him for which there is no other adequate available remedy," that Defendants "owe a clear and certain duty . . . to comply with the procedure set forth in 39 U.S.C. § 3661," and that Defendants' failed to follow those procedures. Compl. ¶¶ 72-84. Plaintiff is not likely to succeed on this claim for the same reasons that Plaintiff is not likely to succeed on the mandamus and *ultra vires* claims. Indeed, it is altogether unclear how the second count of Plaintiff's Complaint is distinct from the other claims.

## II. PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiff has also failed to show that Plaintiff will suffer irreparable harm in the absence of a preliminary injunction. The moving party "must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

*First*, Plaintiff argues that Governor Bullock and the State agencies he oversees have suffered irreparable injury because of their deprivation to a procedural right to a hearing on their section 3661 claims. PI Br. at 21-22. But as discussed above, the deprivation of a procedural right, standing alone, is not even sufficient to establish a case or controversy, let alone to justify the extraordinary remedy of a mandatory injunction. *See Summers*, 555 U.S. at 496.

*Second*, Plaintiff argues that state programs and agencies that rely on the mail might be frustrated in the absence of an injunction. PI Br. at 22-25. But, as discussed above, USPS is now subject to two nationwide injunctions, including one in the Ninth Circuit, and has issued clarifying instructions that address all of the policies challenged in Plaintiff's complaint. The *Washington* court has thus provided Plaintiff with all of the relief Plaintiff seeks in this case. Because Plaintiff cannot show that it will be irreparably harmed in the absence of yet another injunction, the Court should deny Plaintiff's motion for a preliminary injunction or, at the very least, stay its consideration of the motion. *See, e.g.*, *Pars Equality Ctr. v. Trump*, No. 17-cv-0255-TSC (D.D.C. Mar. 2, 2018), ECF No. 143 (staying request for preliminary relief because another nationwide injunction "calls into question whether the harms Plaintiffs allege are actually imminent or certain – a prerequisite for a preliminary injunction"); *Washington v. Trump*, 2017 WL 4857088, at *6 (W.D. Wash. Oct. 27,

34

2017) ("[T]he Hawaii federal district court's injunction already provides Plaintiff States with virtually all the relief they seek in their TRO motion.").

## III.   THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. Plaintiff seeks an injunction that would, among other things, "enjoin Defendants from implementing [the purported 'transformational changes'] or further changes." PI Br. at 28. But, as explained above, the *Washington* court has already issued an injunction enjoining Defendants from implementing the changes, and USPS has issued instructions implementing the *Washington* injunction. The public interest would not be served by the Court issuing what would effectively be an advisory opinion to comply with injunctions entered by other courts.[5] Moreover, while the *Washington* court enjoined the same practices that Plaintiff challenges here, there is a risk that, depending on the terms of the order, an additional injunction could subject the Postal Service to multiple, conflicting injunctions, which would require the Postal Service

---

[5] Plaintiff's proposed injunction also does not comport with Rule 65, which requires that a preliminary injunction order "state its terms specifically." Fed. R. Civ. P. 65(d)(1). Plaintiff seeks an injunction "enjoin[ing] Defendants from implementing [the challenged purported] changes or further changes in contravention of 39 U.S.C. § 3661 and 39 U.S.C. § 101" and "requir[ing] Defendants to reverse any changes already made." PI Br. 27-28. Such broad, non-specific language is inconsistent with Rule 65.

to divert even more resources to complying with conflicting orders. It would not be in the public interest for this Court to issue yet another nationwide injunction to enjoin practices that USPS has already suspended.[6]

## CONCLUSION

Plaintiff's Motion for a Preliminary Injunction should be denied.

---

[6] If the Court is nonetheless inclined to grant injunctive relief, Defendants respectfully request that the Court delay the implementation of any order to allow the parties an opportunity to reach agreement on a proposed order.

DATED this 25th day of September, 2020.

                              Respectfully submitted,

                              JEFFREY B. CLARK
                              Acting Assistant Attorney General

                              ERIC R. WOMACK
                              Assistant Branch Director
                              Federal Programs Branch

                              */s/ John Robinson*
                              JOSEPH E. BORSON
                              KUNTAL CHOLERA
                              ALEXIS ECHOLS
                              DENA M. ROTH
                              JOHN ROBINSON (D.C. Bar No. 1044072)
                              Trial Attorneys
                              U.S. Department of Justice
                              Civil Division, Federal Programs Branch
                              1100 L Street, NW
                              Washington, D.C. 20005
                              (202) 514-1944
                              john.robinson@udoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of September, 2020, a copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 8,500 words, excluding the caption, certificate of compliance, table of contents and authorities, exhibit index, and certificate of service.

*/s/ John Robinson*
John Robinson

## INDEX OF EXHIBITS

| Exhibit No. | Exhibit |
| --- | --- |
| 1 | United States Postal Service (USPS) FY 2019 Annual Report to Congress |
| 2 | Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020) |
| 3 | Clarifying Operational Instructions (Sept. 21, 2020) |
| 4 | USPS OIG Audit Report No. 19XG013NO00O-R-20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020) |
| 5 | Statement of Postmaster General Louis DeJoy (Aug. 18, 2020) |
| 6 | USPS OIG Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020) |
| 7 | Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections (Aug. 21, 2020) |
| 8 | Declaration of Robert Justin Glass |
| 9 | Declaration of Jason DeChambeau |
| 10 | Declaration of Rebecca S. Tinio |
| 11 | Declaration of Jennifer Vo |
| 12 | Declaration of Kevin Couch |
| 13 | Declaration of Robert Cintron |
| 14 | Declaration of Michael L. Barber |
| 15 | Declaration of Angela Curtis |
| 16 | Declaration of Joshua Colin, Ph.D. |
| 17 | Supplemental Declaration of Robert Cintron |
| 18 | Mandatory Stand-Up Talk (Sept. 24, 2020) |
| 19 | Additional Resources for Election Mail (Sept. 25, 2020) |