# EXHIBIT F

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/21/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MONDAIRE JONES, et al.,                 :
                                        :
                    Plaintiffs,         :    20 Civ. 6516 (VM)
                                        :
        - against -                     :    **DECISION AND ORDER**
                                        :
UNITED STATES POSTAL SERVICE, et al.,:
                                        :
                                        :
                    Defendants.         :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs Mondaire Jones, Alessandra Biaggi, Chris Burdick, Stephanie Keegan, Seth Rosen, Shannon Spencer, Kathy Rothschild, Diana M. Woody, Perry Sainati, Robert Golub, Mary Winton Green, Marsie Wallach, Matthew Wallach, Mac Wallach, Carol Sussman, and Rebecca Rieckhoff ("Plaintiffs") filed this action against defendants United States Postal Service ("USPS" or "Postal Service"); Louis DeJoy, as Postmaster General ("DeJoy"), and Donald J. Trump, as President of the United States ("President," and together with the Postal Service and DeJoy, "Defendants" or the "Government"). (See "Amended Complaint," Dkt. No. 36.) Plaintiffs seek declaratory relief and a preliminary injunction mandating that the Postal Service take certain actions to ensure the timely delivery of their absentee ballots in the upcoming national elections being held November 3, 2020. (See "Motion," Dkt. No. 19-1; "Notice of Motion," Dkt. No. 19.)

1

The Court held a hearing on September 16, 2020, and heard witness testimony. For the reasons that follow, the Court GRANTS in part the Motion.

## Introduction

Nothing is more essential to a true democracy than the right to vote. Where that right is constitutionally guaranteed and exercised by citizens through free and fair elections protected by government authority, democratic rule thrives. Conversely, impairing the franchise, or imposing undue burdens on the ability of voters to cast ballots for their elected leaders, necessarily threatens democracy and erodes the underpinnings of a republican form of government. For that reason, this country's founding constitutional principles have designed and enshrined by law the means to ensure free and fair balloting at every level of representative government. To that end, our system has made affirmative provisions not only to ensure maximum ease for citizens to gain access to the ballot box, but also to remove obstacles to voting and repulse attempts, whether by coercion, dilution, discrimination, or other like deleterious means, to interfere with voting rights.

One of the evident ways by which our society fosters and guarantees voting rights is by absentee balloting, accommodating the exceptional needs of citizens unable to

vote in person for various legitimate reasons -- illness, travel, education or employment out of the jurisdiction, or military or diplomatic service. Protecting the franchise of such citizens, and enforcing effective rules to do so, should be no less an essential obligation of the government than is securing voting in person. In fact, the law makes no such distinction. Instead, all voters, regardless of whether they submit their ballots in person or by mail, have a right to have their votes counted and their voices heard. The case before the Court presents these principles.

The context in which this litigation arises is essential to an analysis and resolution of the controversy. The entire world is now in the grip of a catastrophic pandemic caused by the coronavirus, a phenomenon that has inflicted a heavier toll of illness and death on the United States than on any other nation. By recent government count, COVID-19 has already infected over 6.7 million Americans and claimed over 198,000 lives.[1] In its wake, and pertinent to the action before the Court, the disease has engendered widespread fear that conducting elections requiring voters to appear at the polls to cast their ballots in person, there having to occupy enclosed spaces through which thousands of people would pass

---

[1] Centers for Disease Control and Prevention, CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last accessed Sept. 19, 2020).

throughout the day and handle the same voting equipment, would produce conditions conducive to the spread of the illness. To address these concerns, at least 22 states and the District of Columbia have changed their laws to encourage voters to cast their ballots by mail; 34 states and the District of Columbia already permitted anyone to vote by mail, and only five states require an excuse (beyond concerns related to COVID-19).[2] There is no dispute that this development will bring about a predictable effect at issue here: a significant surge in the volume of election mail the USPS is being called upon to handle.

These circumstances present unique challenges and opportunities for public officials, not only those in charge of the Postal Service but also leaders of the rest of the government, federal and state. The crisis demands, as Plaintiffs here urge, extraordinary measures and firm commitment to ensure that all citizens wishing to exercise their right to vote are able to do so without needing to confront an untenable choice: risk contracting a potentially fatal illness by voting in person, or foregoing their right to vote in a presidential election. That prospect likely will

---

[2] Kate Rabinowitz & Brittany Renee Mayes, "At Least 84% of American Voters Can Case Ballots By Mail in the Fall," Wash. Post (Sept. 17, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/ (last accessed Sept. 19, 2020).

come to pass if a mail-in balloting option is available but gives no reliable assurance that citizens could cast their ballots and that their votes would be delivered to election authorities in time to be counted.

Against this backdrop, this case raises some central questions. Some are philosophical and implicate the Postal Service's core mission. The Postal Service has developed a proud reputation for its paramount resolve, memorialized in the famous inscription carved on the pediment of the General Post Office Building in New York City, to deliver the mail despite any obstacles.[3] Postal operations have also been guided by the ethic and spirit of the language of the USPS's charter mandate. That statute evinces a legislative design that the entity is not just another government agency rendering a necessary public service, but one that performs a vital national purpose: to "bind the Nation together." The nation's extraordinary efforts to deliver election mail from members of the armed forces during the Civil War and World War II provide compelling examples of that ingrained commitment.

Beyond these issues implicating the USPS's core values, this case presents various operational and financial

---

[3] "Neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds." Herodotus, The Persian Wars, Bk. 8, ¶ 98 (trans. George H. Palmer).

concerns. How has the Postal Service responded to these
developments? Specifically, are the agency's organization,
operations, and finances adequate to meet the unprecedented
difficulties posed by the combined impact on mail service of
the pandemic and the greater volume of absentee or mail-in
ballots that voters will cast in a few weeks?

To these questions Plaintiffs here answer "No." They
charge that in fact the Postal Service has retreated from the
dedication to its institutional ethic and historical culture
of delivering the mail as an overarching national function.
As evidence, Plaintiffs point to the vision of a
"transformative initiative" recently instituted by DeJoy upon
his assumption of his office -- measures that included, for
example, reduction of overtime pay, elimination of mail
sorting machines on a larger scale than previously done since
2016, directing mail trucks to leave as scheduled, even if it
would entail leaving mail behind for delivery another day.
According to Plaintiffs, such policy and operational changes
have redefined and rechanneled the USPS's mission to follow
the business model of a private enterprise. Under this
approach, according to Plaintiffs, the Postal Service's
commitment to delivering all of the mail may be sacrificed in
the name of efficiency. As evidence, Plaintiffs point out
that, correlating with DeJoy's postal reforms, within weeks

of the adoption of the new approach the service standards for First-Class Mail declined and have not yet fully recovered to reach what they were before the initiatives.

Adding complication to the situation, Plaintiffs call attention to a statement made by President Trump's deputy campaign manager Justin Clark, quoted as having said that "[t]he President views vote by mail as a threat to his election." And the President himself made a statement that was interpreted as urging voters who mail in ballots to also vote in person, in order to test the system.[4]

Accordingly, in the midst of the exceptional demands presented by a national health crisis, and confronted simultaneously with a presidential election that will generate an unprecedented surge of mail ballots, rather than focusing efforts and resources on guaranteeing that citizens' apprehensions about the coronavirus crisis would not impede exercise of their right to vote, the Postal Service, the Postmaster General, and the President have made public statements and taken steps manifesting a somewhat ambiguous course. They have not provided trusted assurance and comfort that citizens will be able to cast ballots with full

---

[4] Maggie Haberman & Stephanie Saul, "Trump Encourages People in North Carolina to Vote Twice, Which Is Illegal," N.Y. Times (Sept. 8, 2020), https://www.nytimes.com/2020/09/02/us/politics/trump-people-vote-twice.html (last accessed Sept. 19, 2020).

confidence that their votes would be timely collected and counted. Rather, as detailed below, their actions have given rise to management and operational confusion, to directives that tend to generate uncertainty as to who is in charge of policies that ultimately could affect the reliability of absentee ballots, thus potentially discouraging voting by mail. Conflicting, vague, and ambivalent managerial signals could also sow substantial doubt about whether the USPS is up to the task, whether it possesses the institutional will power and commitment to its historical mission, and so to handle the exceptional burden associated with a profoundly critical task in our democratic system, that of collecting and delivering election mail a few weeks from now.

The Court is persuaded that the circumstances Plaintiffs portray in their complaint, sufficiently supported by evidence on the record of this proceeding, warrant relief. The right to vote is too vital a value in our democracy to be left in a state of suspense in the minds of voters weeks before a presidential election, raising doubts as to whether their votes will ultimately be counted.

## I.   **BACKGROUND**

### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Postal Service operates over 31,000 Post Offices, 204,274 delivery vehicles, and more than 8,500 pieces of

automated processing equipment. (See "Tinio Decl.," Dkt. No. 24, Ex. 1 at 6.)  It delivers "48 percent of the world's mail volume and more packages to the home than any other business." (Id.) But, while it is a "fundamentally strong organization," the Postal Service is "not financially strong." (Id.) Eroding mail volumes, universal service obligations, and legislative mandates strain its financial stability. (Id.)

 DeJoy became the country's 75th Postmaster General on June 15, 2020. He has stated that he views his role as an opportunity to help the Postal Service "to better serve the American public and also to operate in the financially sustainable manner." (Tinio Decl. Ex. 5, at 5.)

Before his installment as Postmaster General, DeJoy was reported to have made substantial donations to President Trump's re-election campaign. (See Id. at 48.) Further, Plaintiffs note that while the Postal Service is an independent agency, "Secretary of the Treasury Mnuchin and White House Chief of Staff Mark Meadows have been in close contact with both the USPS Board of Governors and Postmaster General DeJoy." (See "Jamison Decl.," Dkt. No. 19-2, ¶ 22.) Plaintiffs suggest that, in an effort to curtail the perceived threat posed by mail-in voting, "[t]he Trump administration is intentionally involving itself in day to day postal operations." (Id. ¶ 27.)

Plaintiffs comprise a collection of individuals from States across the country, including a Democratic candidate for Congress from New York and several New York state and local political candidates, each with interests in the accuracy and integrity of the November 2020 national election (the "Candidate Plaintiffs"); and numerous voters (the "Voter Plaintiffs") who either plan to vote by mail for reasons related to the COVID-19 pandemic -- broadly: (1) travel restrictions that prevent voters from returning to their states of residence, and (2) exposure risks that render in-person voting dangerous -- or, in the case of Spencer, have chosen to risk infection and vote in person because of fears the USPS cannot timely handle Election Mail.

Plaintiffs filed a complaint on August 17, 2020. ("Complaint," Dkt. No. 1.) On September 2, 2020, Plaintiffs filed their Motion. (See Motion; Jamison Decl.; "Jones Decl.," Dkt. No. 19-3, "Biaggi Decl.," Dkt. No. 19-4, "Barrios Decl.," Dkt. No. 19-5; "Mac Wallach Decl.," Dkt. No. 19-6; "Matthew Wallach Decl.," Dkt. No. 19-7; "Marsie Wallach Decl.," Dkt. No. 19-8; "Rieckhoff Decl.," Dkt. No. 19-9; "Rosen Decl.," Dkt. No. 19-10; "Sussman Decl.," Dkt. No. 19-11; "Winton Green Decl.," Dkt. No. 19-12; "Rothschild Decl.," Dkt. No. 19-13; "Green Decl.," Dkt. No. 19-14.)

On September 8, 2020, the Government opposed the Motion. (See "Opposition," Dkt. No. 22; "Barber Decl.," Dkt. No. 23; Tinio Decl.; "Vo Decl.," Dkt. No. 25; "Stasa Decl.," Dkt. No. 26; "Prokity Decl.," Dkt. No. 27; "Glass Decl.," Dkt. No. 28; "DeChambeau Decl.," Dkt. No. 29; "Curtis Decl.," Dkt. No. 30; "Couch Decl.," Dkt. No. 31; "Colin Decl.," Dkt. No. 32; "Cintron Decl.," Dkt. No. 33."

Plaintiffs filed the Amended Complaint on September 9, 2020. The Amended Complaint brings claims under the First and Fifth Amendments of the Constitution against Defendants.[5] On September 10, 2020, Plaintiffs filed a reply. (See "Reply," Dkt. No. 38; "Jamison Reply Decl.," Dkt. No. 38-1; "Barrios Reply Decl.," Dkt. No. 38-4; "Spencer Decl.," Dkt. No. 38-5.)

Before the Court held the hearing in this matter, the Government submitted updated performance data and additional declarations for the Court's consideration. (See "Kochevar

---

[5] Plaintiffs' Amended Complaint brings Count One under 42 U.S.C. Section 1983. Defendants correctly note that this statute does not provide a cause of action against federal officers. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n.4 (2d Cir. 1991). The Court understands Plaintiffs to be seeking relief under the Court's general equitable authority to fashion a remedy for wrongs committed by government officials. See Armstrong v. Exceptional Child Center, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.") (emphasis added). Because Defendants were on notice as to the nature of the claims against them, the Court sees no reason to hold that the claims fail as a matter of law, but will permit Plaintiffs to submit a proposed second amended complaint to correct the cause of action.

Decl.," Dkt. No. 45; "Supp. Cintron Decl.," Dkt. No. 46-1; "Supp. Curtis Decl.," Dkt. No. 46-2.) At the hearing, the Court heard testimony from Julia Bryan, a volunteer for Democrats Abroad; Jose Barrios; Mark Jamison, Plaintiffs' expert witness; Robert Cintron ("Cintron"); Angela Curtis ("Curtis"); and Justin Glass ("Glass"). Following the hearing, Plaintiffs filed an additional exhibit. (See "Supp. Green Decl.," Dkt. No. 47-1.)

    B. <u>CHALLENGED POSTAL SERVICE ACTIONS</u>

Central to the Complaint are a handful of recent "dramatic and profound" policy changes within USPS, including (1) a prohibition on overtime, (2) a ban on late or extra trips even if deliveries are not fully completed, (3) a hiring freeze, (3) a policy titled "Expedited to Street/Afternoon Sortation" ("ESAS") under which carriers are to spend minimal time in the office before departing and are prohibited from sorting mail until the afternoon when they have returned, and (4) widespread equipment reduction, removal, or destruction.

On July 10, 2020, DeJoy participated in a teleconference with area vice presidents and members of headquarters. Defense witnesses Cintron, Vice President of Logistics, and Curtis, Vice President of Retail and Post Office Operations, both participated in the teleconference and testified that

the subject was various initiatives to be implemented. These changes are outlined below.

### 1. <u>Reduction of Late and Extra Trips</u>

During the July 10 teleconference with DeJoy, participants discussed a new policy restricting late and extra trips. According to Cintron, a "late" trip is a trip that departs after its scheduled departure time. (Tr. 45:18-22.[6]) An "extra" trip would be a trip made by "another piece of transportation" to move "additional volume." (Tr. 45:24-46:2.) Cintron insisted that the statements made regarding late and extra trips at the July 10, 2020 meeting did not amount to a "ban," but they did indicate that the "aspiration" was "not to have either one of those." (Tr. 50:17-25.) Curtis echoed these sentiments, explaining that the elimination of late and extra trips was a goal, but that she understood it would not be achieved "overnight." (Tr. 75:5-8.)

Apparently, however, many postal workers received a different message. Following the teleconference, an area vice president created a "Standup Talk" document to memorialize the discussion that occurred on July 10, 2020. (Tr. 49:21-50:8; Amended Complaint Ex. 1.) The July 10, 2020 document titled "Mandatory Standup Talk: All Employees," outlines a

---

[6] All citations to "Tr." refer to the transcript of the hearing this Court held on September 16, 2020. (<u>See</u> Dkt. Minute Entry Dated Sept. 16, 2020.)

"long overdue" "operational pivot," including certain changes
to prior procedures. First, the memo explains that: (1) "late
trips" and "extra trips are no longer authorized or accepted,"
and (2) "[c]arriers must begin on time, leave for the street
on time, and return on time."[7] The memo acknowledged that
"[o]ne aspect of these changes that may be difficult for
employees is that – temporarily -- we may see mail left behind
or mail on the workroom floor or docks . . ." but assures
that "the delayed mail volumes will soon shrink
significantly."

Likewise, a banner hanging in the Portland, Oregon plant
on September 6, 2020 proclaimed, "No Employee has
Authorization to Hold Trucks," along with further directives
stating, "Make sure every single employee in our building
understands - All Trips Depart On Time." (Jamison Reply Decl.
Ex. 1.) And, a post office operations manager in Ohio drafted
a July 14, 2020 PowerPoint presentation regarding DeJoy's
expectations for cost savings, including a directive that
"[t]he plants are not to send mail late," and "[i]f the plants

---

[7] On July 16, 2020, a similar initiative, Expedited to Street/Afternoon
Sortation ("ESAS"), was introduced. (Amended Complaint Ex. 2.) The
initiative was designed to "reduce[] morning office time to allow
carriers to get on the street earlier." Under the new policy, carriers
were directed to spend minimal time in the office in the morning and
"work any unsorted mail into the delivery sequence for delivery the
next scheduled day," after returning from the street. This program has
been suspended as part of a union grievance process. (Motion at 2,
n.3.)

are not on time they will hold the mail for the next day."
(Supp. Green Decl. at 3; Tr. 73:19-74:8.)

While Curtis was "appalled" by this July 14 PowerPoint
presentation, which she considered a misrepresentation of
directives from the Postmaster General (Tr. 73:22), these
circumstances reflect evidence of conflicting signals or
confusion, at the very least that different Postal Service
employees understood their instructions differently. And, at
any rate, a reduction of late and extras did in fact occur.
Glass testified that because of the initiative, "[w]e have
had a significant reduction in both lates and a reduction in
extra services." (Tr. 47:23-48:3.)

### 2. Limits on Overtime

Jose Carlos Barrios ("Barrios"), a Mail Processing Clerk
at the San Antonio Main Post Office with 33 years of
experience, testified that overtime was being cut back. This
measure was also listed in the July 14 PowerPoint as one of
DeJoy's expectations. (Supp. Green Decl. at 1 ("POT will be
eliminated. This is not cost effective and it will be taken
away. Overtime will be eliminated. Again we are paying too
much in OT and it is not cost effective and will soon be taken
off the table.").) DeJoy, however, testified before the House
Oversight and Reform Committee that he "never put a limitation
on overtime," and that overtime could continue to be approved

"as needed." (Tinio Decl. Ex. 14, at 25; <u>see also</u> Colin Decl. ¶ 4.) Nonetheless, he stated that he intended to issue guidance on when managers could approve overtime, presumably to clarify, given evident confusion on the subject. (<u>See</u> <u>id.</u> at 27.)

### 3. <u>Changes in Hiring</u>

USPS experienced staffing shortages because of the COVID-19 pandemic. John Prokity ("Prokity"), manager of Workforce Planning Insights & Analytics, explained that the Postal Service adjusted its hiring processes because of these pandemic-related staffing shortages. (Prokity Decl. ¶¶ 4-7.) Prokity acknowledged that USPS has instituted a hiring freeze for management-level positions, but this did not affect mail carriers, mail handlers, and clerks. (<u>Id.</u> ¶ 6 n.1.)

Plaintiffs' expert Mark Jamison ("Jamison"), a former Postal Service employee with over 36 years of experience, explained that for the non-management-level positions, USPS agreed to relax certain hiring rules, including the union-negotiated limitation on temporary employees. That change has "led to the addition of more than 88,000 new untrained temporary employees." (Tr. 33:8-12; <u>see also</u> Tr. 22:22-25.) Glass, Manager of Operations Industrial Engineering, confirmed this statement, testifying that the USPS has hired untrained temporary employees to fill vacancies, and further

16

confirming that those workers *would* be handling Election Mail.[8] (Tr. 108:9-21.)

### 4. Equipment Destruction and Removal

In connection with Plaintiffs' claims about destruction and removal of equipment, two items are at issue: mail collection boxes and targeted reductions of 18 to 20 percent in mail sorting machines.[9] Regarding the mail collection boxes, Jennifer Vo ("Vo"), director of City Delivery and Postal Service Headquarters and USPS employee of 26 years, testified that blue collection boxes are regularly removed based on volume to "ensure that mail collection within areas served by letter carriers is accomplished in a cost-efficient manner, while still meeting customers' needs." (Vo Decl. ¶ 5.) However, "[p]ursuant to Postmaster DeJoy's recent directive, the Postal Service has stopped removal of collection boxes . . . not to resume until after the November Presidential election." (Vo Decl. ¶ 18.)

Other defense witnesses gave similar accounts regarding the sorting equipment reductions. Michael Barber, soon to be the USPS Vice President of Processing and Maintenance

---

[8] The term "Election Mail" refers to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots. (Glass Decl. ¶ 3.)
[9] Reduction targets vary by type of machine. (Amended Complaint Ex. 3, at 2.)

Operations, with over 29 years of experience within the postal service, testified that, "[d]ue primarily to the large decline in mail volume over the past decade, we have more machines than are needed to process the mail." (Barber Decl. ¶ 5.) Barber described how the USPS monitors utilization and performance data in real-time. He pointed to current national utilization levels ranging between 35 and 65 percent, concluding that even if every voter chose to vote by mail, there would still be excess processing capacity. (Id. ¶ 6.) Jason DeChambeau, Headquarters Director of Processing Operations, echoed that "[t]he Postal Service has removed and/or replaced unnecessary or outdated mail processing and sorting equipment for many years," both when they become outdated and need to be replaced, and when "they are no longer needed to process the volume of mail." (DeChambeau Decl. ¶ 7.) He indicated that the current equipment-reduction initiative began in January 2017. (Id. ¶ 14.)

Plaintiffs dispute whether the removal and destruction of this equipment was done in the normal course. Barrios testified, for example, that, based on his experience, the handling of machines was "a dramatic departure from past practice." (Barrios Decl. ¶ 26.) He explained that, when volume dipped in the past, sorting machines were powered down rather than destroyed, leaving the facility "the ability to

18

start them back up when mail volume spiked." (Id. ¶ 27.) This
flexibility allowed postal employees "to address the dramatic
seasonal differences" in mail volume. (Id.) This time,
however, according to an email Plaintiffs obtained dated
August 18, 2020, postal employees have been directed "not to
reconnect/reinstall machines that ha[d] previously been
disconnected without approval from HQ Maintenance, no matter
what direction they [got] from their plant manager." (Green
Decl. Ex. 4, at 1.)

Plaintiffs further argue that the greatest reductions
were implemented in "major cities, likely to skew
Democratic." (Motion at 20.) They submitted a map created by
the Washington Post titled "Postal Service Reduction in
Sorting Capacity," indicating that sorting capacity,
expressed as the number of pieces of mail sorted per hour,
has declined disproportionately across the country, with
declines concentrated in population-dense areas. (Green Decl.
Ex. 5; Compl. ¶ 90.)

### 5. Changes to Election Mail Handling

The Postal Service's approach to handling Election Mail
has also experienced changes in recent months.  Jamison
explained that "as recently as the 2018 election the USPS
typically treated election mail as 1st class mail, even if it
was sent at marketing mail rates." (Jamison Decl. ¶ 28). Glass

similarly testified that USPS historically devoted "excess First-Class Mail processing capacity to Election Mail." (Glass Decl. ¶ 21.) He explained, however, that this is simply a "longstanding practice" and that "no formal policy" requires it. (Id.) Cintron confirmed that some Election Mail is being delivered as "[M]arketing [M]ail." (Tr. 61:16-24.)

Barrios's testimony also points to changes in USPS's approach to Election Mail. He testified that the March 2020 primary Election Mail did not receive the special processing it did in earlier election years. (Tr. 24:2-14; Barrios Decl. ¶ 25.) For example, during the March 2020 primary, managers directed employees to run Election Mail through the first set of sorting machines initially, rather than pulling them aside to be sorted and canceled separately, as was the previous practice. (Barrios Decl. ¶ 23.) Barrios estimated that because of this directive, his facility missed about a quarter of what came through in initial sorting. (Id. ¶ 24.) This directive is still in place for the November election. (Id. ¶ 23.) When Barrios raised the issue with management, "they just simply did not" fix the problem. (Tr. 24:25.) Dennis Stasa, Senior Plant Manager at the same facility as Barrios, testified that the facility has not changed Postal Service protocols to process election mail during the last two elections, "and continues to follow this standard protocol

today." (Stasa Decl. ¶ 19.) However, Barrios testified, in remarks the Court found credible, that as a result of the changes about 600 ballots were left on the mail room floor. (Tr. 25:14-20.)

Defense witnesses have testified regarding certain practices the USPS has in place to handle Election Mail. For example, Glass testified that USPS uses "all clears" to ensure that Election Mail is accounted for. (Glass Decl. ¶ 19.) Through this process, USPS employees "use a checklist to confirm that mail scheduled or 'committed' to go out that day has gone out, and anything committed for the next day is at the front of the line." (Id. ¶ 19.)

Nonetheless, an August 31, 2020 report prepared by the Office of the Inspector General ("OIG") found that of seven facilities audited, none used the Postal Service's Operational Clean Sweep Search Checklist. (Tinio Decl. Ex. 4, at 5.) And "[s]ix of the seven facilities used their own variation of the Election and Political Mail logs." (Id.) While the OIG report did not evaluate the recent changes at issue in this case, it indicates that prior audits by the OIG found that "the Postal Service needed to improve communication between headquarters, mail processing facilities, and election officials," "train staff on Election and Political Mail processes," and "appropriately align

21

resources to process peak Election and Political Mail
volume." (Id. at 1.)

Further, while Glass testified that there will be "no
changes in service standards as it applies to election mail"
(Tr. 95:19-23), Jamison disagreed, referencing letters sent
between July 29 and 31, 2020 by General Counsel and Executive
Vice President, Thomas Marshall, to 46 states regarding
election mail. (Tr. 31:18-32:1; Jamison Decl. ¶ 28). The
letters provide usual transit times for First-Class and
Marketing Mail and recommend that Election Officials send out
ballots using First-Class Mail. (Amended Complaint Ex. 5.)
The letters further flag "mismatch[es]" between USPS delivery
speeds and the state law deadlines for requesting and casting
mail-in ballots. (Id. at 2.) The letters warn that "this . . .
creates a risk that ballots requested near the deadline under
state law will not be returned by mail in time to be counted
. . . ." (Id.).

In light of USPS's historical practice of treating all
Election Mail as First-Class Mail, Jamison viewed the letters
as "a threat, like an abandonment of those long-term cultural
commitments, that that mindfulness of how important ballots
are is gone and they're just going to follow the regulations."
(Tr. 31:18-32:1; see also Jamison Decl. ¶ 28.)

Despite DeJoy's repeated assurances that the USPS has the capacity to handle all Election Mail this November, even *before* his operational changes were introduced, the OIG found that "the amount of identifiable Election and Political Mail delivered on-time nationwide was 94.5 percent from April 2020 through June 2020, a decrease of 1.7 percentage points compared to the same period in 2018." (Tinio Decl. Ex. 4, at 5.) Further, in an apparent acknowledgment of the public doubts and precarious operational situation the USPS is experiencing, Glass explained that USPS will employ ballot monitors in every processing facility during the week before the election and through Election Day to monitor postmarking and ensure ballots are being processed. (Glass Decl. ¶ 39.)

Glass further stated that often postal employees "undertake extraordinary efforts to accelerate the delivery of ballots." (Glass Decl. ¶ 23.) Among these "extraordinary" measures, according to Glass, postal employees in one instance segregated ballots and sent them as Priority Mail Express. (Id. ¶ 25.) In another, postal employees made additional deliveries on Sunday, and in some cases have delivered ballots on a same-day basis. (Id. ¶ 26.)

Apart from the installation of ballot monitors and the use of "all clears" and logs to track Election Mail through the USPS network, the extra measures USPS contemplates taking

23

are considered "practices" not "policies," meaning, as Glass explained, that they are not required and are instead "typically left to local managers" to implement. (Tr. 100:5-9.) With regard to why these practices are not more uniform or formal policies, he testified that "expediting measures cannot be applied equally." (Tr. 105:8-9.) Glass pointed to measures in place to monitor such practices, but also noted that if the practices were not properly implemented, by the time headquarters investigated, it would be too late for affected ballots. (Tr. 104:11-18.) He also observed that "not in every case is every method the same and . . . valid," because "[y]ou can't deliver[] throughout the entire state of Georgia where you might be able to deliver to the city of Atlanta," for example. (Tr. 103:5-8.) Furthermore, some of these measures require the use of overtime. (Tr. 107:3-9.) Cintron testified that in the past, USPS has run late trips to ensure that Election Mail is delivered, and that the same plan would be in place this year. (Tr. 68:2-6.) However, as discussed above, USPS employees appear to lack clear guidance regarding whether, and under what circumstances, overtime is permissible. See supra Section I.B.2. Glass testified that, if overtime is restricted, the capacity of USPS employees to undertake extra measures to deliver Election Mail would be diminished. (Tr. 107:10.)

6. Evidence of Delay and Its Impact

Whether mail delivery delays have occurred is not in dispute. At an August 24, 2020 hearing before the House Oversight and Reform Committee, DeJoy acknowledged that there was a decline in presort First-Class Mail service since July. (Green Decl. Ex. 1, at 27.) The delay is likewise reflected in an August 12, 2020 Service Performance Measurement briefing which includes a chart showing a steep decline in service standards for presort First-Class Mail and Marketing Mail beginning in mid-July.[10] (Green Decl. Ex. 2, at 2, 3.) Similarly, performance data showing nationwide service performance for "market-dominant" products, including First-Class and Marketing Mail, shows that between January 2020 and August 2020, First-Class Mail declined from 91.76 percent on time to 88.04 percent, and Marketing Mail dropped from 91.21 percent on time to 89.56 percent. (Kochevar Decl. Ex. 1, at 2.) This performance decline occurred despite a "virus-driven decline" in mail volume, which Defendants concede.[11] While the performance data reflect fluctuations, the largest dip with

---

[10] While the scores rebound slightly, they begin to decrease again in late July. (Green Decl. Ex. 2, at 2, 3.) The Postal Service has indicated that its goal is for 96.5 percent of First-Class Mail to be on time. (Tr. 36:23-24; Glass Decl. ¶ 17; Tinio Decl. Ex. 5, at 34.) When the service standard has a score of 88.04 percent, therefore, it is 8.5 percentage points below the goal. (Tr. 58:17-18.)

[11] Tinio Decl. Ex. 2 (Quoctrung Bui & Margot Sanger-Katz, Can the Post Office Handle Election Mail?, N.Y. Times, Aug. 20, 2020). The New York Times additionally reports that "recent restrictions on overtime do appear to have slowed postal processing in some parts of the country." (Id.)

respect to both classes of mail occurred the week of July 18, coinciding with the rollout of DeJoy's initiatives, and the on-time rate for First-Class Mail has not rebounded. (Id.)

The parties do not disagree that, to some degree, the restrictions on late and extra trips caused these delays. Curtis testified that the delays resulted from a "perfect storm," including the effects of COVID-19, *and* "this increased energy and focus on trips on time." (Tr. 86:4.) Likewise, Cintron agreed that, the focus on strict schedule adherence did come at the cost of service in July and August. (Tr. 66:22-67:3.) As Plaintiffs' expert Jamison explained, "[i]f processing the mail intended for [a particular] truck hasn't been completed, when the truck leaves, delays in delivery occur. And those delays escalate and pyramid over days." (Tr. 34:15-18.) He characterized the "insistence on maintaining the rigid adherence to postage transportation Schedules" as having "[p]erhaps the greatest impact." (Tr. 34:5-7.)

But the other operational changes have contributed to these postal service delays as well. For example, in a letter dated July 29, 2020, the American Postal Workers Union stated that machine removal has "a direct negative impact on reduced service standards" and "has contributed to delayed mail." (Green Decl. Ex. 7, at 5.) Barrios agreed, testifying that

"[t]he absences of these machines will place a burden on our
ability to process the mail as our Seasoned Holiday Mail would
start . . . coming in." (Barrios Decl. ¶ 20.) And while Barber
testified that, despite the equipment reductions, if changes
in volume occur, USPS will be able to "quickly address and
remedy any machine processing capacity issue" that results
(Barber Decl. ¶ 6), this notion is undermined by an  email
from Kevin Couch, Director of Maintenance Operations, dated
August 18, 2020, indicating that postal employees were "not
to reconnect/reinstall machines that ha[d] previously been
disconnected without approval from HQ Maintenance, no matter
what direction they [got] from their plant manager." (Green
Decl. Ex. 4, at 1.)

Barrios testified that the San Antonio facility is
currently running on average two to three days behind its
usual service standard, and that the current delays in mail
delivery will continue into November because there are not
enough "qualified supervisors that know how to properly
expedite the mail." (Barrios Decl. ¶ 6; Tr. 22:17-20.)  And
because USPS is "hiring brand new employees with no official
training," while limiting overtime, experienced postal
employees are effectively prohibited from lending a helping
hand. (See Tr. 22:22-23:3.)

Taken together, these delays have a direct bearing on the fundamental voting rights issues now before the Court. Specifically, if the Postal Service's mail delivery levels remain at current levels or continue to decline, under operational policies apparently still in place, such curtailed performance would put the ability of voters to timely cast their ballots at risk. On this point, Cintron expressly testified that Election Mail could be included among the mail left behind as a result of the heavy focus on adhering to departure schedules. (Tr. 68:20-24.) Barrios explained that "[w]hile our past practices would position us well to handle what is likely to be a significant task in pulling out and specially handling an unprecedent volume of election mail, the reduced capacity from missing machines, as well as the (constantly shifting) micro-management and inflexibility is a disaster in the making." (Barrios Decl. ¶ 30.)

The impact of these operational changes is even greater this year considering the significant number of voters who plan to cast their ballots by mail. In plaintiff Mondaire Jones's primary election in New York's 17th Congressional District, which includes Rockland and parts of Westchester County, approximately 61.1 percent of the ballots were cast

by mail.   (Jones Decl. ¶ 6). The voter Plaintiffs in this action all plan to vote by mail. (E.g., Spencer Decl. ¶ 6).

International voters face even greater obstacles. Julia Brown ("Brown"), a volunteer for Democrats Abroad living in Prague, testified about the "nixie issue," which arises "when a ballot or other voting material, such as a ballot request, is received within the U.S. postal system" but ultimately returned to sender. (Tr. 12:22-13:2.)  The issue has arisen earlier in 2020 than it did in 2016. Brown added that international voters cannot use private mail carriers as an effective alternative because they can be costly, unreliable, and for regions where ballots must be addressed to P.O. boxes, simply unable to deliver. (Tr. 16:14-22.)

C. THE PARTIES' ARGUMENTS

Plaintiffs argue that the changes in Postal Service policies and operations detailed above will undermine the integrity of the November national election by causing delays in delivery (and, ultimately, counting) of mail-in ballots. While Plaintiffs admit they do not know the precise measure of the potential disenfranchisement, they allege that it will be undoubtedly meaningful in light of the "record volume of absentee and other mail ballots" expected because of the pandemic. Plaintiffs offer evidence -- internal memos and publications -- both substantiating that these changes were

implemented and suggesting that delay has already begun to
occur. The evidence includes several news articles appearing
in reputable publications drawing that conclusion. Attached
to their motion, Plaintiffs offer evidence indicating that
the reductions in machinery have been concentrated in swing
states or major cities "likely to skew Democratic."

Plaintiffs argue that these deviations from past USPS
policies and practices will result in the infringement of
their First Amendment right to vote and to have their votes
equally counted under the Fifth Amendment. They seek a
declaratory judgment holding that Defendants have violated
their rights under the Constitution, and an injunction both
(1) ensuring that USPS may proceed with Election Mail
operations unencumbered by these policy changes, and (2)
unwinding or mitigating any damage that has already occurred.

In response to the Plaintiffs' factual allegations, the
Government asserts that "nearly all" of the operational
changes have been suspended, including "equipment and
collection box removal, certain routine aspects of overtime
management, . . . changes to retail hours, . . . plans to
consolidate or close any facilities, and a limited pilot
program for mail carriers." (Opposition at 13.) The "ongoing
effort to improve compliance with existing schedules,"
however, has not been suspended and will continue. (Id. at 13

n.9.) The Government further disclaims responsibility for certain of the policy announcements (i.e., relating to overtime, parking restrictions, and prohibitions on late and extra trips), explaining that they were communicated by "local manager[s]" without approval from headquarters. (Opposition at 19 n.14; see also id. at 18 n.13.) Regarding delay, the Government admits that some delay has occurred but insists it has been mitigated by the suspension of policy changes and adjustment to the procedures (such as the new transportation compliance rules).

## II.  <u>JURISDICTION</u>

As it must, the Court first determines whether it has jurisdiction to hear this suit. While Defendants argue that Plaintiffs do not have standing because they have failed to show a certainly impending injury, and also fail to demonstrate that their injury is traceable to and redressable by Defendants, the Court holds that Plaintiffs satisfy Article III standing requirements. Defendants also argue that Plaintiffs' claims are moot, but the Court disagrees again, and holds that Plaintiffs have presented a live controversy.

### A. <u>STANDING</u>

#### 1. Legal Standard

The "Constitution requires that anyone seeking to invoke federal jurisdiction . . . have standing to do so." <u>Crist v.</u>

Comm'n on Presidential Debates, 262 F.3d 193, 194 (2d Cir. 2001). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l, 568 U.S. 398, 408 (2013). To demonstrate that Article III's standing requirements are met, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), 528 U.S. 167, 181–82 (2000). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations and quotation marks omitted); see New York v. Trump, No. 20-cv-5770, 2020 WL 5422959, at *9 (S.D.N.Y. Sept. 10, 2020).

The injury-in-fact requirement is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." Susan B. Anthony List, 573 U.S. at 158 (internal quotation marks and citation omitted). A "future injury" can suffice, if it is "certainly impending, or there is a

substantial risk that the harm will occur." Id. at 157; see Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013) (explaining that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about"); House of Representatives, 525 U.S. at 332-33 (finding standing where certain jurisdictions were "substantially likely . . . [to] suffer vote dilution") (internal quotation marks and citation omitted).

Traceability requires showing "a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (internal quotation marks, alterations, and citation omitted). However, traceability does not require "[p]roximate causation." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014). "Article III 'requires no more than de facto causality.'" Dep't of Commerce v. New York, 139 S. Ct. at 2566 (quoting Block v. Meese, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). Traceability is satisfied when a "theory of standing" relies "on the predictable effect of Government action on the decisions of third parties," Dep't of Commerce v. New York, 139 S. Ct. at 2566, "even when the decisions are illogical or unnecessary,"

New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 59 (2d
Cir. 2020).

Redressability requires a showing that is "likely, as
opposed to merely speculative, that the injury will be
redressed by a favorable decision." Lujan, 504 U.S. at 561
(internal quotation marks and citation omitted). The
plaintiff need not "show that a favorable decision will
relieve his *every* injury." Dep't of Texas, Veterans of
Foreign Wars of U.S. v. Texas Lottery Comm'n, 760 F.3d 427,
432 (5th Cir. 2014) (citing Larson v. Valente, 456 U.S. 228,
243 n.15 (1982)).

"[A] plaintiff must demonstrate standing for each claim
and form of relief sought." Cacchillo v. Insmed, Inc., 638
F.3d 401, 404 (2d Cir. 2011). The standing inquiry is
"especially rigorous when reaching the merits of the dispute
would force [a federal court] to decide whether an action
taken by one of the other two branches of the Federal
Government was unconstitutional." Raines v. Byrd, 521 U.S.
811, 819-20 (1997). To demonstrate standing for injunctive
relief, a plaintiff "cannot rely solely on past injuries;
rather, the plaintiff must establish how he or she will be
injured prospectively and that the injury would be prevented
by the equitable relief sought." Marcavage v. City of New
York, 689 F.3d 98, 103 (2d Cir. 2012).

2. Application

Voter Plaintiffs have shown a "substantial risk" that the ballots of voters in certain regions are less likely to be counted because of delayed mail service. See Susan B. Anthony List, 573 U.S. at 157; House of Representatives, 525 U.S. at 332-33 (finding standing where certain jurisdictions were "substantially likely . . . [to] suffer vote dilution").

Defendants argue that the Voter Plaintiffs have not demonstrated standing because their alleged injury is too speculative. Defendants contend that USPS has already suspended many challenged procedures and is endeavoring to ensure the timely delivery of mail, such that mail delays are unlikely. But, as discussed above, there is sufficient evidence suggesting that substantial mail delivery delays persist, and the rollback of policies has not been fully implemented or adequately communicated throughout the entire Postal Service organization, which is tiered in multiple national, regional, and local levels.

Additionally, in letters addressed to officials in 46 states, USPS acknowledged that, even absent a slowdown, voters face a "significant risk that [they] will not have sufficient time to complete and mail the completed ballot back to the election official in time for it to arrive by the state's return deadline" and that risk is (in some cases)

"exacerbated by the fact that the law [in some states] does not . . . impose a time period by which election officials must transmit a ballot to the voter." (See, e.g., Amended Complaint Ex. 5, at 1-2.) A two-day mail delivery delay occasioned by postal operations, even if unintentional, would only increase the likelihood of impairing voting rights. As USPS has "itself forecast[ed] the injuries," it is "disingenuous for [USPS] to claim that the injury is not sufficiently imminent." See New York v. U.S. Dep't of Homeland Sec., 2020 U.S. App. LEXIS 24492, at *25 (2d Cir. Mar. 2, 2020).

Defendants suggest that the Voter Plaintiffs have not shown an injury, because they can avoid injury by mailing their ballots early. The Court is not persuaded. Defendants' argument overlooks that the mail delays will predictably force some citizens -- such as plaintiff Shannon Spencer -- to vote in person and potentially suffer harm in the form of exposure to COVID-19. See Black Voters Matter Fund v. Raffensperger, No. 20 Civ. 01489, 2020 U.S. Dist. LEXIS 143209, at *55-61 (N.D. Ga. Aug. 11, 2020) (finding injury and standing where state law forced plaintiff to choose between paying postage or risking COVID-19 infection by voting in-person); see Dep't of Commerce v. New York, 139 S. Ct. at 2566. This prospect constitutes an injury even if

voters "decisions [to vote in person] are illogical or unnecessary," by, for example, overlooking the possibility of voting early. New York v. U.S. Dep't of Homeland Sec., 969 F.3d at 59.

Given the substantial likelihood that, due to mail delays, certain votes are likely not to be counted, Candidate Plaintiffs also have standing. Contrary to Defendants' contention, Candidate Plaintiffs need not allege that the mail issues will cause them to lose to show an injury. The challenged mail procedures injure electoral candidates because "[c]andidates have an interest not only in winning or losing their elections, but also in ensuring that the final vote tally accurately reflects the votes cast." Gallagher v. N.Y. State Bd. of Elections, 20 Civ. 5504, 2020 WL 4496849, at *9 (S.D.N.Y. Aug. 3, 2020).

The Court further concludes that Plaintiffs have shown traceability and redressability. The rollout of the challenged policies coincided with a sharp decline in on-time delivery rates from the already-depressed pandemic rates. This fact, together with the testimony described above, makes clear that the challenged mail procedures have slowed mail service and are thus a de facto cause of Plaintiffs' claimed injuries. This harm may be lessened by declaratory and

injunctive relief targeted at minimizing delays in mail delivery.

    B. <u>MOOTNESS</u>

    Defendants argue that the Court lacks jurisdiction because Plaintiffs' claims are moot. Defendants contend that USPS has suspended many measures that Plaintiffs criticized and has a demonstrated commitment to delivering Election Mail in a timely fashion.

    "A case becomes moot -- and therefore no longer a 'Case' or 'Controversy' for purposes of Article III -- 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013) (quoting <u>Murphy v. Hunt</u>, 455 U.S. 478, 481 (1982) (per curiam)). However, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." <u>Id.</u> (citing <u>City of Mesquite v. Aladdin's Castle, Inc.</u>, 455 U.S. 283, 289 (1982). Otherwise, as the Supreme Court explained in <u>Nike</u>:

> a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends. Given this concern, our cases have explained that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."

<u>Id.</u> (quoting <u>Laidlaw</u>, 528 U.S. at 190).

Here, Defendants have not even shown that the challenged practices have ceased. Tellingly, they declare that "nearly all" of the challenged USPS policies and operations have been suspended. But, how many potentially uncounted votes could remain in undelivered mail in the gap between "all" and "nearly all" of the practices at issue? The Government concedes that one practice -- the "ongoing effort to improve compliance with existing schedules" -- has not been, and will not be, suspended. (Opposition at 13 n.9.) As discussed above, USPS has not fully restored mail delivery service levels. See supra. And substantial evidence indicates that the supposed rollback of the challenged practices is either unenforced and not yet fully implemented or possibly insincere. See supra. The controversy Plaintiffs raise remains very much alive.

### III. **LEGAL STANDARDS**

A. PRELIMINARY INJUNCTION

Ordinarily, a preliminary injunction may be granted when the party seeking the injunction establishes that "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." Otokoyama Co. Ltd. v. Wine of Japan Import, Inc., 175

F.3d 266, 270 (2d Cir. 1999). But when the injunction sought is mandatory, i.e., when it "will alter rather than maintain the status quo," the movant must show 'clear' or 'substantial' likelihood of success. No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 233 (2d Cir. 1999)).

B. APPLICABILITY OF ANDERSON-BURDICK

One important open question with respect to the legal standards applicable in this case, though ultimately not a dispositive one, is whether the Court should apply the so-called Anderson-Burdick test, derived from Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992). In Anderson, Burdick, and their progeny, the Supreme Court "articulated a 'flexible standard' to evaluate 'Constitutional challenges to specific provisions of a State's election laws.'" Daunt v. Benson, 956 F.3d 396, 406 (6th Cir. 2020) (quoting Burdick, 460 U.S. at 434; Anderson, 460 U.S. at 789). When applying the Anderson-Burdick test, a court first considers the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." Anderson, 460 U.S. at 789. This inquiry requires a determination of "content-neutrality and alternate means of access." Citizens for Legislative Choice v. Miller, 144 F.3d 916, 921 (6th Cir. 1998). For example, a

limitation on political participation by an identifiable
political group would not be content-neutral, and thus would
impose a severe burden. Id. As another example, a law would
impose a severe burden if it left "few alternate means of
access to the ballot" and so "restrict[ed] the availability
of political opportunity." Daunt, 956 F.3d at 407 (quoting
Miller, 144 F.3d at 921).

After determining the burden, the court evaluates the
state's justifications for its rule. The level of scrutiny
depends on the burden; for severe restrictions, the
regulation must be "narrowly drawn to advance a state interest
of compelling importance." Burdick, 504 U.S. at 434. If the
state election law imposes "reasonable, nondiscriminatory
restrictions" on First and Fourteenth Amendment rights, then
"the State's important regulatory interests are generally
sufficient to justify" the restrictions. Id. (quoting
Anderson, 460 U.S. at 788). If the state election law burden
is "moderate," then the court uses a flexible analysis, which
involves simply weighing the burden against the state's
asserted interest and means of pursuing it. Daunt, 956 F.3d
at 408-09 (citations omitted).

The parties dispute whether the Anderson-Burdick test
applies to Plaintiffs' claims. The Government argues the test
is used solely to evaluate state election laws, and so is

inapplicable here. The Government further argues that the framework should not be extended to this case because the assumptions underlying the framework do not apply here, relying on the premise that this case does not implicate "the counting of votes," apportionment, or "election regulations," and also does not raise any First Amendment concerns. (Opposition at 30.)

Plaintiffs counter that even if the Anderson-Burdick framework does not apply, the test does not increase the level of scrutiny applied to restrictions on the right to vote, but rather can only reduce the applicable level of scrutiny. Plaintiffs argue that in older cases predating Anderson-Burdick, courts simply applied strict scrutiny without regard to the severity of the burden. Thus, Plaintiffs assert that even if the Court finds that Anderson-Burdick should not be applied in a suit challenging federal actions, the claims should still be assessed under strict scrutiny given that the fundamental right to vote is at stake.

It is unsurprising that Anderson-Burdick has never been applied to federal actors. After all, our country has a highly decentralized system of election administration, in which states and localities are primarily responsible for regulating and managing elections. See U.S. Const. art. 1, § 4; Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S.

1, 8 (2013) ("The Elections Clause . . . imposes the duty"
on states "to prescribe the time, place, and manner of
electing Representatives and Senators"). The Court also
disagrees with the Government that this case does not
implicate "the counting of votes." To hold otherwise would be
to ignore the facts at hand: a large number of voters will be
exercising their right to vote in the November 2020 election
by placing their ballots in the mail. There is simply no
reason for the Court to ignore the severe reality that the
country is in the middle of a deadly pandemic, that only five
states require an affirmative excuse for citizens to vote by
mail, and one state (Oregon) conducts elections entirely by
mail. Indeed, the USPS has affirmatively held itself out as
a partner to state and local election authorities, and
recognizes that it is a crucial player in the election.

Nevertheless, the Court need not decide whether
Anderson-Burdick applies. First, Plaintiffs are correct that
the test can only lower the level of scrutiny. Since the Court
finds that Plaintiffs have shown a substantial likelihood of
success on the merits even when reviewing the restrictions
under a lower standard, Anderson-Burdick is largely beside
the point. Second, and relatedly, the framework may not yield
a different outcome than the traditional equal protection and
First Amendment analyses. Indeed, at the first step --

deciding the burden -- a court asks essentially the same questions that are relevant to straightforward First Amendment and Equal Protection analyses, e.g., content-neutrality and alternative means of access. For these reasons, the Court declines to answer whether Anderson-Burdick should be extended to cases challenging the constitutionality of restrictions on voting caused by a federal entity.

C. APPLICABILITY OF MCDONALD

The Government also argues that under McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802 (1969), the Court should apply rational basis review.[12] McDonald involved an Illinois statute that denied certain inmates mail-in ballots. The Court held that the statute did not restrict their right to vote, but rather only their asserted right to an absentee ballot, and that they were thus not "absolutely prohibited from voting by the State." Id. at 808 n.7. The Court observed that the record lacked evidence that the State would not, for example, "furnish the jails with special polling booths . . . or provide guarded transportation

---

[12] The Court notes a tension in the Government's position. The Government argues that Anderson-Burdick applies only to cases involving state election laws, but McDonald similarly involved a state election law, and asked whether voters were being prohibited from voting "by the State." 394 U.S. at 808 n.7. If Anderson-Burdick should not apply, neither should McDonald.

to the polls." Id. at 808 n.6. On these facts, the Court applied rational basis review and upheld the statute.

The Court finds that McDonald is inapposite. The Supreme Court has expressly restricted its applicability to cases in which there is no evidence showing that the challenged restriction will prohibit the plaintiff from voting. As the Supreme Court recognized just a few years later, first in Goosby v. Osser, 409 U.S. 512 (1973), and then again in O'Brien v. Skinner, 414 U.S. 524 (1974), McDonald was a case that "[e]ssentially . . . rested on failure of proof," because there was nothing in the record to show that the inmates were "in fact absolutely prohibited from voting by the State." O'Brien, 414 U.S. at 529 (quoting McDonald, 394 U.S. at 808 n.7). And again, in Hill v. Stone, 421 U.S. 289, 300 n.9 (1974), the Court distinguished McDonald as a case in which "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote. The Court pointed to language in McDonald stating that "[a]ny classification actually restraining the fundamental right to vote . . . would be subject to close scrutiny." Id. Where the facts demonstrate that there is a "not trivial" burden on the right to vote, McDonald is inapplicable. Price v. New York State Bd. of Elections, 540 F.3d 101, 110 (2d Cir. 2008); see also id. at 109 ("[I]t is important only that

45

there is at least some burden on the voter-plaintiffs'
rights."); see also id. at 109 n.9 ("McDonald does not alter
our analysis . . . [because] the record in this case is not
similarly barren."). Because such facts are in the record
before the Court, McDonald is distinguishable and rational
basis review inappropriate.[13]

## IV.  LEGAL ANALYSIS

Because the Court finds that Anderson-Burdick does not
govern the analysis, Plaintiffs' claims must be assessed as
standalone equal protection and First Amendment violations.
The Court begins with Plaintiffs' Fifth Amendment equal
protection claim.

### A. EQUAL PROTECTION CLAIM

Plaintiffs argue that USPS's policies and practices
generally, and specifically as they relate to Election Mail,
do not comport with the Fifth Amendment's guarantee of equal
protection because they render voters' ability to cast an
effective vote dependent on arbitrary factors, such as the
particular USPS branch that handles their ballots.

---

[13] While the Fifth Circuit recently upheld the continued validity of
McDonald in the equal protection context in Texas Democratic Party v.
Abbott, 961 F.3d 389 (5th Cir. 2020), that court did not squarely address
whether there may be a right to access an absentee ballot in conditions
of national emergency, such as this country has been facing for several
months now, given that a law requiring in-person voting presents severe
burdens -- a proposition not contested by the Government.

"[E]qual protection . . . require[s] the uniform treatment of" similarly situated individuals. Reynolds v. Sims, 377 U.S. 533, 565 (1964). "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." Bush v. Gore, 531 U.S. 98, 104 (2000) (per curiam). Once citizens have been granted the right to vote, the government "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id. at 104-05 (citing Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665 (1966)).[14]

In a series of apportionment cases in the 1960s, the Supreme Court developed the one person, one vote standard, which requires that congressional, state, and local legislative districting schemes be designed to weight votes equally.[15] In Reynolds, for example, the Court held that "the

---

[14] Harper and Bush v. Gore were decided under the Fourteenth Amendment Equal Protection Clause, which applies only to the states. Although the Fifth Amendment, which binds the federal government, contains no explicit guarantee of equal protection, "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." Buckley v. Valeo, 424 U.S. 1, 93 (1976), superseded on other grounds by statute, see McConnell v. Fed. Election Comm'n, 540 U.S. 93 (2003); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 214-218 (1995); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."). Indeed, it would be "unthinkable that the same Constitution would impose a lesser duty on the Federal Government" than on the states. Bolling v. Sharpe, 347 U.S. 497, 500 (1954).

[15] Of course, exceptions always exist. Special purpose districts, for example, are not subject to the one person, one vote standard. See, e.g., Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719

Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis" to ensure votes are weighted equally. 377 U.S. at 568. The Court explained that "[d]iluting the weight of votes because of place of residence" violates the Equal Protection Clause "just as much as invidious discriminations based upon factors such as race or economic status." Id. at 566 (internal citations omitted).

The Reynolds Court offered two theories to explain the importance of an equally weighted vote. First, the Court explained that an equally weighted vote is necessary to ensure that citizens have effective representation:

> [R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.

Id. at 565. Second, the Court reasoned that malapportioned districts communicate a message of inequality, suggesting that some are "less a citizen" than others. Reynolds, 377

---

(1973) (holding that elections for the directors of a water-storage district could weight votes according to the assessed valuation of each voter's land).

U.S. at 567. The Court deemed such a message inconsistent with "[t]he concept of 'we the people' under the Constitution" which "visualizes no preferred class of voters." Id. at 558.

The Supreme Court extended the equal protection principles of its one person, one vote jurisprudence in Bush v. Gore to decide the constitutionality of the mechanisms used to recount votes in Florida. The Court's analysis began by observing that "the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." 531 U.S. at 104. The Court then articulated the rule that equal protection entails an "obligation to avoid arbitrary and disparate treatment of the members of [the] electorate" that results in "valu[ing] one person's vote over that of another." Id. at 104-05.

Applying these principles, the Supreme Court concluded that the "the recount mechanisms implemented" in Florida did "not satisfy the minimum requirement for nonarbitrary treatment of voters." Id. at 105. "Much of the controversy" in that case "revolve[d] around ballot cards designed to be perforated by a stylus but which, either through error or deliberate omission, ha[d] not been perforated with sufficient precision for a machine to register the perforations." Id. The Florida Supreme Court "ordered that

the intent of the voter be discerned from such ballots." Id.
The Supreme Court deemed this command "unobjectionable as an
abstract proposition and a starting principle." Id. at 106.

The problem, in the Supreme Court's view, was "the
absence of specific standards to ensure its equal
application." Id. Absent precise guidance from the Florida
Supreme Court, different counties "used varying standards to
determine what was a legal vote." Id. at 107.[16]   Even
dissenting Justices Souter and Breyer agreed with the
majority that more uniform recount standards should have been
applied. See id. at 134 (Souter, J., dissenting) ("I can
conceive of no legitimate state interest served by these
differing treatments of the expressions of voters'
fundamental rights. The differences appear wholly
arbitrary."); id. at 146 (Breyer, J., dissenting) ("I agree
that, in these very special circumstances, basic principles
of fairness should have counseled the adoption of a uniform
standard to address the problem.").

In Gallagher v. New York State Board of Elections, No.
20 Civ. 5504, 2020 WL 4496849, at *19 (S.D.N.Y. Aug. 3, 2020),

---

[16] Additional equal protection problems the Supreme Court identified
included (1) differences in the treatment of undervotes and overvotes,
(2) the lack of "assurance that the recounts included in a final
certification must be complete," and (3) the failure to specify who would
count ballots and how observers could make objections. See Bush v. Gore,
531 U.S. at 107-09.

the district court relied on Bush v. Gore to hold that
plaintiffs demonstrated a likelihood of success on their
equal protection claim where due to the "inconsistent
application of postmarks to absentee ballots" by USPS, the
primary election "suffered from a lack of 'specific standards
to ensure . . . equal application' of [the state statute's]
postmark rule." Specifically, the Court found "strong
evidence that USPS locations in Brooklyn handled absentee
ballots differently from the postal service locations in the
other boroughs" and that "a significant number of Brooklyn
ballots that should have been postmarked were not." Id. The
court reasoned that "[w]hether an individual's vote will be
counted in this race, therefore, may depend in part on
something completely arbitrary -- their place of residence
and by extension, the mailbox or post office where they
dropped off their ballot." Id. Such an arbitrary process, the
court explained, lacked "sufficient guarantees of equal
treatment" and constituted "the type of differential
treatment that the Supreme Court has found to violate the one
person, one vote principle." Id. (quoting Bush v. Gore, 531
U.S. at 107).

Defendants contend that Plaintiffs' equal protection
claim cannot succeed because Plaintiffs have not alleged
purposeful or intentional discrimination. This argument

51

reflects a fundamental misunderstanding of the one person, one vote standard. The one person, one vote doctrine does not "place on plaintiffs any burden of proving that" a system that unequally weights or counts votes "represents a deliberate effort to dilute some group's voting power." Tucker v. U.S. Dep't of Commerce, 958 F.2d 1411, 1414 (7th Cir. 1992); see Grant M. Hayden, The False Promise of One Person, One Vote, 102 Mich. L. Rev. 213, 222 (2003) ("[T]he one person, one vote standard . . . enjoys the doctrinal privilege of being one of the few Equal Protection Clause violations actionable without a showing of discriminatory intent."). In cases where a showing of intentional discrimination is required, that requirement serves "to prevent the concept of equal protection from being used to invalidate governmental policies that just happen to bear more heavily against a vulnerable group." Tucker, 958 F.2d at 1414. In contrast, the one person, one vote cases "vindicate a right that the Supreme Court has found to be implicit in the Constitution" to an election system that fairly counts and weights votes. Id. The "failure to create the required mechanism is an intentional denial of the right to an equally weighted vote." Id.

Thus, in Bush v. Gore, the Court concluded that a violation of equal protection occurred without making a

finding of discriminatory intent on the part of the Florida Legislature or the Florida Supreme Court. See Gallagher, 2020 WL 4496849, at *20. Similarly, in Harper, on which Bush v. Gore relied, the Supreme Court invalidated a poll tax absent evidence of an intent to discriminate based on race or wealth. Harper, 383 U.S. at 670. With regard to the state's argument that the poll tax was as innocuous as a driver's license fee, the Court remarked that "[t]he degree of discrimination is irrelevant." Id. at 668. Likewise, when a plaintiff challenges a Congressional districting plan on a one person, one vote theory, the plaintiff need only show that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." Karcher v. Daggett, 462 U.S. 725, 730 (1983); see Franklin v. Massachusetts, 505 U.S. 788, 806 (1992) (citing Karcher for the proposition that plaintiffs "bear [the] burden of proving disparate representation").[17] The burden then shifts to the government to show "that each significant variance between districts was necessary to achieve some legitimate goal." Karcher, 462 U.S. at 731.

---

[17] Although Defendants cited Franklin in their Opposition, they do not discuss this aspect of the Supreme Court's decision. (See Opposition at 25 n.20 (citing Franklin, 505 U.S. at 802-03).)

In sum, the Supreme Court has consistently declined to require a showing of discriminatory purpose in the context of one person, one vote cases. Defendants offer no authority to the contrary. Accordingly, the Court will not impose such a requirement in this case. In any event, the Court observes that OIG reports had put USPS on notice of inconsistencies in the handling of Election Mail and the need for improved communications and training on Election Mail processes. (See Tinio Decl. Ex. 4, at 1 (discussing prior audits)).

Defendants further contend that the equal protection principles Plaintiffs invoke do not apply to USPS's handling of Election Mail. Yet, states are relying on USPS as a "vital partner in administering a safe, successful election." (Amended Complaint Ex. 7 (Letter from the leadership of the National Association of Secretaries of State to DeJoy dated August 7, 2020)). And, even the nuts and bolts of election administration must comport with equal protection. Bush v. Gore stands for the proposition that an equal protection violation occurs when arbitrary disparities in voting mechanisms make it less likely that voters in certain areas will cast votes that count. Nonuniform mail service functions in the same way as the nonuniform vote counting standards at issue in Bush v. Gore, making it less likely that absentee voters in certain areas will cast votes that count, due in

substantial part to failures in the Postal Service's Election Mail operations. Defendants offer no persuasive explanation for why USPS should be exempt from the same standards that apply to other government entities that handle ballots. Defendants cannot seriously contend, for example, that the Constitution permits USPS to refuse to carry the ballots of minority voters or to arbitrarily shred ballots. See Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("Not only can this right to vote not be denied outright, it cannot, consistently with Article I, be destroyed by alteration of ballots or diluted by stuffing of the ballot box.") (citing United States v. Classic, 313 U.S. 229 (1941); United States v. Saylor, 322 U.S. 385 (1944)).

The cases described above all concern disparities in the weighting and counting of votes cast within the same state. Defendants contend that "it is not clear how the 'one person, one vote' principle could ever be applied across state lines." (Opposition at 25 n.19.) Defendants' point is that, in federal elections, a voter's vote is not weighted exactly the same as those of voters in other states. Consider, for example, elections for the United States Senate. The two Senators from Wyoming represent around 580,000 people, while the two Senators from California represent over 39 million people. An individual voter in Wyoming therefore comprises a larger

share of the electorate than an individual voter in California. This deviation from population-based representation reflects the "Great Compromise" that resolved the "bitter controversy" between large and small states that "came near ending the [Constitutional] Convention without a Constitution." Wesberry, 376 U.S. at 10-13. With regard to the United States House of Representatives, the Great Compromise called for Representatives to "represent the people as individuals, and on a basis of complete equality for each voter." Id. at 14. This aim, however, cannot be perfectly achieved. Although Congressional districting schemes can achieve near mathematical equality *within* each state, it is "virtually impossible to have the same size district in any *pair* of states." U.S. Dep't of Commerce v. Montana, 503 U.S. 442, 463 (1992) (emphasis added). This result follows because Article 1, Section 2 of the Constitution requires that a fixed number of Representatives be allocated among states of varying sizes, so that even the smallest states have at least one Representative, and that Representatives not be split between states. See id. And, due to the design of the Electoral College -- in which each state has as many electors as it has Senators and Representatives in Congress -- these interstate disparities carry over into presidential elections. See U.S. Const. art. II, § 1. Thus,

in the interstate context, votes are weighted with constitutional proportionality rather than exact mathematical equality.

The Defendants are not sure what to make of this electoral phenomenon. They offer no precedent or argument on what the right to an equal vote means in the interstate context. Defendants' only remark in this regard is that "it is not clear . . . ." (See Opposition at 25 n.19.)

But one proposition is abundantly clear. The Supreme Court's one person, one vote decisions are concerned with ensuring voters' rights to fair and effective representation and equal dignity, and these rights retain their force even when votes are not weighted with precise mathematical equality. In Gray v. Sanders, 372 U.S. 368, 380 (1963), the Court observed that "the Constitution visualizes no preferred class of voters," and underscored "the dignity" of "the right to have one's vote counted." The Court's decision in Reynolds echoed this emphasis on the equal dignity of voters, recognizing that "[a] citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm." 377 U.S. at 568. The Court in Reynolds further proclaimed that "every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." Id. at 565. And, in Bush v. Gore,

the Court reaffirmed "the equal dignity owed to each voter."
531 U.S. at 529.

To effectuate these rights, the Court required that
votes be weighted equally for purposes of Congressional and
state legislative elections. See Reynolds, 377 U.S. at 565
("Full and effective participation by all citizens in state
government requires, therefore, that each citizen have an
equally effective voice in the election of members of his
state legislature."); id. at 567 ("To the extent that a
citizen's right to vote is debased, he is that much less a
citizen."). In other words, an equally weighted vote is a
means of putting into operation a broader right of political
equality. The Supreme Court endorsed this understanding in
Gaffney v. Cummings, 412 U.S. 735, 748 (1973), explaining
that the "reason" the Court "insisted on substantial equality
of populations among districts" in Reynolds was to "achiev[e]
fair and effective representation for all citizens."

It follows that a voter's right to fair and effective
representation and equal dignity can be vindicated even when
her vote is not accorded exactly equal weight to that of other
voters. "Fair and effective representation . . . does not
depend solely on mathematical equality among district
populations." Id. at 748-49. The Supreme Court has cautioned
against "[a]n unrealistic overemphasis on raw population

figures." Id. at 749.[18] Indeed, with regard to the United States House of Representatives, the Supreme Court has plainly instructed:

> While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us.

Wesberry, 376 U.S. at 18.

In sum, Defendants' doubts about the applicability of the one person, one vote cases in the interstate context reflect a reductivist reading of those cases as focused on equipopulous districts. But the one person, one vote cases recognize a voter's rights to fair and effective representation and equal dignity -- rights which retain force in the interstate context. Consider, for example, a voter in Portland, Oregon, who intends to cast a vote in a Congressional race. If her ballot is not transmitted in time due to her local post office's delays, her "right to full and

---

[18] An equally weighted vote is a legal fiction insofar as apportionment reflects imperfect census data. See Karcher, 462 U.S. at 732 ("[C]ensus data are not perfect . . . ."); Gaffney, 412 U.S. at 745 (recognizing that census data "are inherently less than absolutely accurate"). Moreover, even where the requirement for equally populated districts applies, districts can deviate somewhat from equal population to achieve permissible goals. See Gaffney, 412 U.S. at 741-42 (discussing permissible deviations for Congressional districts and state legislative districts); see also Mahan v. Howell, 410 U.S. 315, 319 (1973) (upholding an apportionment plan for a state legislature with a 16.4 percent maximum variation).

effective participation in the political processes of h[er]
[Nation]'s legislative bodies" is impaired relative to that
of both in-state and out-of-state voters with access to USPS
branches functioning effectively. Reynolds, 377 U.S. at 565.

Though the election challenges now confronting our
nation are unprecedented, a suit against the federal
government for violating the right to an equal vote is not
novel. See, e.g., Wisconsin v. City of N.Y., 517 U.S. 1
(1996); Franklin, 505 U.S. 788; U.S. Dep't of Commerce v.
Montana, 503 U.S. 442. In Montana, plaintiffs sued the federal
government, alleging that the method used to determine the
number of Representatives to which each state is entitled in
the House of Representatives violated Article I, Section 2.
Essentially, plaintiffs disagreed with the mathematical
formula that Congress adopted to apportion seats among the
states. The method that Congress selected aimed to minimize
the relative differences between the size of Congressional
districts. Plaintiffs preferred an approach that would have
minimized absolute deviations from the ideal district size.
Recognizing that the claims raised a question of interstate,
rather than intrastate, voting equality, the Court deemed the
questions justiciable, but ultimately concluded that "the
polestar of equal representation does not provide sufficient
guidance to allow" the Court to decide between the parties'

preferred mathematical measures of inequality. Id. at 463; see id. at 461 ("[I]t is by no means clear that the facts here establish a violation of the Wesberry standard."). The Court further reasoned that Congress is due "a measure of discretion that is broader than that" due the states in making apportionment decisions. Id. at 464. As plaintiffs had not shown that any alternative method was more consistent with equal representation than Congress's chosen method, and because Congress's choice was supported by historical practice and entitled to deference, the Court upheld Congress's "apparently good-faith choice." Id.

Franklin involved a challenge to the Secretary of Commerce's decision to allocate federal employees serving overseas to states for purposes of the apportionment count. The Secretary's decision to allocate oversees federal employees to their home states altered population counts enough to shift a Representative from Massachusetts to Washington. The Court concluded that "[t]he Secretary's judgment does not hamper the underlying constitutional goal of equal representation" and "assuming that employees temporarily stationed abroad have indeed retained their ties to their home States, actually promotes equality." Franklin, 505 U.S. at 806.

In Wisconsin, relying on Franklin and Montana, the Supreme Court upheld the Census Bureau's decision not to statistically adjust the 1990 Census results to correct for a differential undercount of racial and ethnic minority groups. 517 U.S. 1. The Second Circuit had applied heightened scrutiny to review the Secretary's decision because it affected the fundamental right to an equal vote. Id. at 4. The Supreme Court reversed, emphasizing that "the text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual enumeration,'" and that the Secretary's decision was made "pursuant to Congress' direct delegation of its broad authority . . . ." Id. at 19, 17. The Court further observed that application of strict scrutiny to the Secretary's decision concerning a statistical adjustment would be inconsistent with Montana's recognition that constitutional goal of equal representation does not provide a means of choosing between various measures of equality. Id. at 17-18. Rather than applying strict scrutiny to the Secretary's decision, the Supreme Court set forth the following standard:

> [S]o long as the Secretary's conduct of the census is consistent with the constitutional language and the constitutional goal of equal representation, it is within the limits of the Constitution. In light of the Constitution's broad grant of authority to Congress, the Secretary's decision not to adjust need bear only a reasonable relationship to the accomplishment of an

actual enumeration of the population, keeping in mind
the constitutional purpose of the census.

Id. at 19-20 (quotations and citations omitted). On the
facts, the Court concluded that the Secretary's decision
conformed to constitutional requirements.

Collectively, these decisions confirm that the right to
equal representation recognized in the Supreme Court's one
person, one vote cases applies in the interstate context,
even though an equal vote in the interstate context is one of
constitutionally proportional -- as opposed to mathematically
equal -- weight. They also suggest that, when an agency is
exercising authority delegated by Congress, the agency is due
greater deference than states are given in malapportionment
cases.

Applying the above principles, the Court concludes that
Plaintiffs have demonstrated a substantial likelihood of
success on their Fifth Amendment equal protection claim.
Equal protection entails an "obligation to avoid arbitrary
and disparate treatment of the members of [the] electorate"
that results in "valu[ing] one person's vote over that of
another." Bush v. Gore, 531 U.S. at 104-05. An equal
protection violation occurs when arbitrary disparities in
voting mechanisms make it less likely that voters in certain
areas will cast votes that count. See id.

Here, Plaintiffs have identified a profound and troubling lack of standards and uniformity with regard to USPS's handling of Election Mail. One example is the July 14 PowerPoint. This PowerPoint states that because of "HIS expectations" (i.e., DeJoy's), "[o]vertime will be eliminated." (Supp. Green Decl. at 2.) Yet DeJoy testified to Congress, "I have never put a limitation on overtime." (Tinio Decl. Ex. 14 at 25.) The PowerPoint warns that "[a]ll routes will have no more than 4 park points. We will be moving towards that this summer." (Supp. Green Decl. at 4.) Yet Defendants submit that "there is no nationwide USPS policy setting a fixed cap on the number of park points." (Opposition at 20; Colin Decl. ¶¶ 13-14.) Defendants argue that this document was "prepared by a local manager," that it never represented Postal Service policy, and that the district-level manager issued a clarification. (Opposition at 19 n.14.) Yet the fact remains that the creator of the document perceived the content to reflect DeJoy's expectations. This demonstrates a stunning lack of uniformity and a high level of confusion at various points in the USPS hierarchy regarding the standards to be followed by USPS employees on the ground.

So too with other evidence in the record. The Mandatory Standup Talk states in clear terms that "late trips are no longer authorized or accepted," and the same for extra trips.

(Amended Complaint Ex. 1.) Defendants have insisted that this document mischaracterizes official policy. (Opposition at 18 n.13; Cintron Decl. ¶ 24 n.1.) Yet Curtis and Cintron both testified that the contents of this Talk "draw[] from a July 10, 2020 teleconference, conducted with [Area Vice Presidents] and members of Headquarters," and that during the teleconference, "members of Headquarters made statements reflected, in part," in the Talk. (Supp. Cintron Decl. ¶ 3; Supp. Curtis Decl. ¶ 3.) Curtis testified at the hearing that, "at least" for her part, she "walked away with the understanding that . . . [they] were going to have to work through," in each case, what had caused a late trip, and so did not perceive the guidance to mean "a ban on late or extra trips." (Tr. 75:18-76:8.) In other words, the Talk contained "some absolutes" where Defendants contend Headquarters intended none. (Tr. 75:17-18.) Needless to say, the author of the Standup Talk perceived the applicable rule differently.

With respect to both the July 14 PowerPoint and the Standup Talk, Defendants stress that USPS took corrective action, specifically that clarifications were issued, and the employee who wrote the PowerPoint was even demoted. Yet on reply, Plaintiffs submitted a Twitter post-dating to September 6, 2020, displaying a photo of a banner in the Portland, Oregon plant that states, in no uncertain terms,

65

that trucks must depart on time with no exceptions. According
to the person who posted the image, Postal Service truck
drivers have claimed some trucks leave nearly empty due to
DeJoy's "mandate." (Jamison Reply Decl. Ex. 1.) Months later,
it appears that whatever top-down communication issues caused
the creation and communication of the July 14 PowerPoint and
the Standup talk have not been resolved. A conclusion that
these managerial and communication deficiencies are likely to
impact the handling of Election Mail finds strong support in
the OIG's reports, which have identified the need for improved
communications and training regarding the handling of such
mail. (See Tinio Decl. Ex. 4, at 1.) The Court is left with
little reason to believe that the USPS policy and operational
picture will be any clearer for postal employees as the
November election approaches.

Plaintiffs have thus made a sufficient showing that the
lack of uniformity in the Postal Service's treatment of
Election Mail among local post offices will result in
intrastate and interstate disparities in citizens' voting
power. As in Bush v. Gore, the "absence of specific standards"
facilitates the "arbitrary and disparate treatment [of]
voters" and, ultimately, the unequal weighting of votes
across geographic areas. 531 U.S. at 106-107. Specifically,
"[w]hether an individual's vote will be counted . . . may

66

depend in part on something completely arbitrary -- their place of residence and by extension, the mailbox or post office where they dropped off their ballot." Gallagher, 2020 WL 4496849, at *19. The predictable outcome of the differential treatment of ballots within and across states by reason of mail handling delays would constitute a dilution of votes, an impairment of the right to fair and effective representation, and a violation of the equal dignity owed to each voter.

The Court need not decide the level of scrutiny that should apply to USPS's actions because it is likely that Plaintiffs would succeed under any standard. If, for example, the Court applies a deferential standard similar to the test announced in Montana, Plaintiffs will likely establish an equal protection violation. USPS's non-uniform, and at different times and places conflicting or confusing Election Mail policies and practices are not consistent with securing "the goal of equal representation." 503 U.S. at 462 n.41.

USPS has offered no satisfactory explanation for failing to set clear, uniform policies for the handling of Election Mail. It has given no persuasive assurances that the "practices" it touts to ensure the delivery of Election Mail will be uniformly applied. USPS's purported rollback of "nearly all" policies linked to mail delays is either

incompletely implemented, inadequately communicated throughout the organization, or unreliable. The institutional confusion in Postal Service communications, operations, and practices that Plaintiffs have identified can serve no legitimate purpose. With regard to the one challenged policy that USPS is officially retaining -- the restriction of "lates and extras" (Tr. 47:25-48:1) -- Plaintiffs will likely succeed in demonstrating that USPS lacks a legitimate justification for rolling out (and retaining) the policy, which has contributed to meaningful documented delays in service, in the middle of a pandemic when service standards were already impaired and a vast influx of mail-in ballots expected. (See Green Decl. Ex. 2.)

For these reasons, the Court concludes that USPS has "not satisf[ied] the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." Bush v. Gore, 531 U.S. at 106.

B. FIRST AMENDMENT CLAIM

Because the Court finds that Plaintiffs have demonstrated that injunctive relief is warranted under the Fifth Amendment, it need not reach Plaintiffs' arguments regarding the infringement of their First Amendment right to vote. However, given the uncharted territory and open legal questions raised by the facts in this case, and to obviate a

remand in the event, on appeal, the Second Circuit disagrees with the Court's Fifth Amendment holding, the Court alternatively finds that Plaintiffs have demonstrated a clear and substantial likelihood of success on the merits of their First Amendment claim.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." It is well established that voting implicates First Amendment rights. Yang, 960 F.3d at 130 ("[Plaintiffs'] interest . . . 'to cast their vote effectively' falls squarely within the ambit of the protection offered by the First Amendment."). While election-related cases generally involve states and not the federal government, given states' "broad power to regulate the time, place, and manner of elections," the "responsibility to observe the limits established by the First Amendment," Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 222 (1989) (quoting Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986)), applies with no less force to the federal government. Furthermore, laws enacted under the postal power must also comply with the First Amendment. See Hiett v. United States, 415 F.2d 664, 669 (5th Cir. 1969) (a law that affects expression -- here, a prohibition on mailing an advertisement for getting a divorce abroad -- must not violate the First Amendment "even if enacted under the

postal power," despite its broad nature); <u>Tollett v. United
States</u>, 485 F.2d 1087, 1091 (8th Cir. 1973) (construing a law
"in the light of the First Amendment rather than in the light
of any regulatory power granted to the Postal Service");
<u>Greenberg v. Bolger</u>, 497 F. Supp. 756, 775 (E.D.N.Y. 1980)
(noting "the obvious relationship" between access to the
mails and the First Amendment).

Defendants assert, however, that this case does not
implicate either "First Amendment voting interests" or "free
expression through the mail." (Opposition at 31.)[19] Instead,
Defendants urge that the challenged conduct consists of
"operational decisions" that concern "only the timing of the
physical delivery of mailed ballots." (Opposition at 31.) The
Government further argues that in any event, such a claim
would fail because "a conduct-regulating statute of general
application that imposes an incidental burden on the exercise
of free speech rights does not implicate the First Amendment."

---

[19] Defendants also argue that plaintiffs have waived any stand-alone First
Amendment claim other than the <u>Anderson-Burdick</u> framework. The Court
disagrees, given that the Complaint and Amended Complaint clearly allege
an infringement of their First Amendment Right to Vote, and Plaintiffs'
opening brief devotes an entire section to the applicability of the First
Amendment to the Postal Service. (Brief at 11-12 ("First Amendment
Scrutiny Applies to Acts of USPS . . . .").) Defendants cannot claim they
were not on notice with respect to a First Amendment claim, and indeed
the Opposition disputes the validity of such a claim. <u>See Beckman v. U.S.
Postal Serv.</u>, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000). Furthermore,
because the Government does not argue that First Amendment scrutiny does
not apply in general to the USPS, they have conceded that point.

(Opposition at 37 (quoting Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 209 (2d Cir. 2004)).)

The Court disagrees. Plaintiffs allege more than an incidental burden on their right to vote: Plaintiffs allege that due to confusion and misdirection at the Postal Service, and coinciding with a pandemic that effectively necessitates voting by mail, there is a substantial likelihood that their ballots will not be counted because of delays in Election Mail service. See Florida Democratic Party v. Scott, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (explaining that because "statutory framework completely disenfranchises thousands of voters," it "amounts to a severe burden on the right to vote"). Couching the challenged actions as operational decisions cannot convert this risk to an incidental burden on Plaintiffs' First Amendment rights. Even if the challenged actions could be construed as operational decisions, the USPS cannot accomplish through such means what would otherwise constitute a burden on the right to vote. This outcome holds especially when the Government hails the herculean efforts by the USPS to assist state election officials, including by conducting outreach and implementing purported special mail handling practices. (Opposition at 34 ("USPS is undertaking extensive efforts to ensure timely delivery of Election Mail, with the express aim of preventing the possible

disenfranchisement which plaintiffs hold up as a severe burden.").) By the same token, election officials rely on USPS as a "vital partner in administering a safe, successful election." (Amended Complaint Ex. 7.)

The Court thus finds that the First Amendment is implicated in Plaintiffs' voting rights claim. In the usual First Amendment context, a court assesses multiple factors, including whether the forum subject to the restriction is public. Here, it is settled that the mail is not a public forum. See USPS v. Council of Greenburgh Civic Assocs., 453 U.S. 114 (1981). Normally, when the government regulates speech in a nonpublic forum, the regulation need only be reasonable and content-neutral. Silberberg v. Bd. of Elections of N.Y., 216 F. Supp. 3d 411, 417 (S.D.N.Y. 2016); Longo v. U.S.P.S., 983 F.2d 9, 11 (2d Cir. 1992) (upholding USPS regulation prohibiting campaigning on postal premises). For example, in Council of Greenburgh, a civic association umbrella group wanted to distribute messages in residents' letterboxes without going through the USPS, and challenged a law that forbid them from doing so. The Court recognized the broad postal power conferred by Article I, but noted that "it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment." Nevertheless, the Court rejected the

civic group's First Amendment claim. Because mail is not a public forum, the Court simply determined whether the challenged restriction was reasonable and content-neutral. Greenburgh, 453 U.S. at 131 n.7. Because it was, it was permissible. Id. at 132.

Because this case involves voting rights, the usual non-public forum analysis is rendered less apt. Indeed, Plaintiffs suggest that because Defendants have infringed their voting rights, if Defendants' conduct is not assessed under Anderson-Burdick, strict scrutiny automatically applies. (Reply at 12 n.9 ("[M]any older voting rights decisions apply strict scrutiny automatically as soon as the right to vote is restrained . . . .").) To be sure, "[t]he right to vote derives from the right of association that is at the core of the First Amendment." Storer v. Brown, 415 U.S. 724, 756 (1974) (Brennan, J., dissenting).

For example, in Evans v. Corman, 398 U.S. 419 (1970), the Court struck down a Maryland statute that barred residents of a federal enclave (the National Institutes of Health) from voting. The Court noted that "the right to vote, as the citizen's link to h[er] laws and government, is protective of all fundamental rights and privileges. And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close

constitutional scrutiny." Id. at 422 (citations omitted). The
Court rejected Maryland's only asserted interest, which was
ensuring that only those citizens who were substantially
affected by electoral decisions could have a voice.
Similarly, in Cipriano v. City of Houma, 395 U.S. 701 (1969),
another Fourteenth Amendment case, the Court applied strict
scrutiny because the challenged state statute only permitted
some people to vote in a utility bond election. See also
Kramer v. Union Free Sch. Dist. No. 15, 395 U.S. 621, 626
(1969) ("[A]ny alleged infringement of the right of citizens
to vote must be carefully and meticulously scrutinized.").

The most recent and most relevant example of application
of strict scrutiny to assess a voting rights claim in the
Election Mail context is Gallagher. There, the court noted
that the question before the court was not the abstract burden
presented by the New York statute, but rather the "as applied"
burden, which was "the burden created by enforcing the
postmark requirement in an election where thousands of
ballots . . . were rendered invalid by its application." 2020
WL 4496849, at *16. The court found this burden "exceptionally
severe," because a large number of ballots would be
invalidated. The court found that "in light of the ongoing
COVID-19 pandemic, there was an uncommonly compelling reason
for many voters to vote by absentee ballot." Id. Because the

burden on voters' rights was severe, the court applied strict scrutiny and concluded that the state statute was unconstitutional as applied.

If strict scrutiny applies in the instant case, the Government's asserted interests are insufficient. The Government offers no justification for its incomplete rollback of its prior postal policies that concededly produced a decline in mail service. As for the one retained policy that restricts "lates and extras", the Government asserts that the Postal Service's "operational choices . . . reasonably relate to timely and efficiently delivering the nation's mail" and "continuing its regular operations" (Opposition at 32, 36). That explanation is not enough. The Bill of Rights was "designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy." Stanley v. Illinois, 405 U.S. 645, 656 (1972). Thus, the Supreme Court has held that the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." Watson v. City of Memphis, 373 U.S. 526, 537 (1963). Moreover, "[t]he possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing [Plaintiffs'] First Amendment rights." Tashjian, 479 U.S. at 218. And here,

considering the Government's justifications in context, with
respect to timeliness and efficiency, the Government does not
show why, after two years of planning, it increased urgency
around an initiative to encourage adherence to shipping
schedules in the middle of election season coinciding with a
pandemic. The Postal Service met or was near its service
standard goals for First-Class Mail in May, and despite dips
into performance levels in the 80s in April, service standards
had begun to enter the low 90s before DeJoy's "transformative
initiative" rolled out. The most recent data in the record,
however, reflects an 88 percent standard, a significant
deviation from the USPS's 96.5 percent target.

Of course, not every passing reference to voting rights
in a First Amendment claim will trigger strict scrutiny, which
is why the Anderson-Burdick test is useful; it accounts for
the severity of the burden upfront and adjusts the level of
scrutiny accordingly, so that "not every limitation or
incidental burden on the exercise of voting rights is subject
to a stringent standard of review." Rogers v. Corbett, 468
F.3d 188, 194 (3d Cir. 2006) (quoting Bullock v. Carter, 405
U.S. 134, 143 (1972)). But even assuming, for the sake of
argument, that some lesser form of scrutiny applied here, the
Court finds that the Government has not met its burden of
demonstrating a sufficient interest in sustaining mail

policies or operations that potentially curtail voting rights. Intermediate scrutiny also demands some showing of tailoring and necessity. As noted above, the Government provides scant reason for the Court to find that the challenged USPS actions could not wait until after the November national election. Thus, it does not matter whether the Postal Service's actions are evaluated under strict scrutiny or a more intermediate level of scrutiny; the result is the same.

Because Plaintiffs have asserted a sufficient burden on their right to vote, it is immaterial whether the restrictions here are content-based or content-neutral. The Court notes, however, that there is some ambiguity in that regard. Plaintiffs initially seem to make the argument that the Postal Service's actions raise equal protection concerns because sorting capacity was reduced more dramatically in swing states and cities likely to vote Democratic. Defendants have raised no authenticity concerns with the map included in the Amended Complaint, which demonstrates where sorting capacity was most reduced. But there are other plausible explanations. It is possible that sorting capacity was most reduced in areas with the most excess sorting capacity. Conceivably the reduced capacity has no practical significance -- that is, the reduced capacity will not actually affect the Postal

Service's ability to sort the mail in those demarcated areas. But given that Plaintiffs have brought forward at least some evidence to the contrary, there is simply not enough factual basis in the record for the Court to make such a finding. (See Barrios Decl. ¶ 6 (the removal of two sorting machines, "the pandemic, and other policy changes" caused "extraordinary mail backlog and delay").)[20] Cf. Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 189 (2008).

### C. INJUNCTIVE RELIEF

For the reasons discussed above, the Court finds that Plaintiffs have demonstrated a clear and substantial likelihood of success on the merits. The parties disagree whether Plaintiffs can show the other elements of injunctive relief, particularly irreparable harm. "In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm." Gallagher, 2020 WL 4496849, at *14 (citing Conn. Dep't of Envtl. Prot. v. O.S.H.A., 356 F.3d 226, 231 (2d Cir. 2004)). Thus, "no separate showing of irreparable harm is necessary." Statharos v. N.Y. City Taxi & Limousine Comm'n, 198 F.3d 317, 322 (2d Cir. 1999). In any event, the Court finds that Plaintiffs

---

[20] While the Court does not suggest or make any specific finding that the Postal Service intended to target certain areas, doing so would obviously be enough to constitute a content-based burden on speech, even if the Postal Service's actions were facially neutral. Reed v. Town of Gilbert, 576 U.S. 155 (2015).

have made a strong showing of irreparable harm and demonstrated a clear and substantial likelihood of success on the merits, for the reasons discussed above. The Court does not construe Plaintiffs' assertion that "the scale of disenfranchisement . . . is unclear" as a concession but rather an apt description of the lack of clarity surrounding the Postal Service's actions and how voters will respond to the decline in service standards. (Motion at 7.) The test for a preliminary injunction is satisfied.[21]

Consequently, the question becomes what the scope of that relief should be. Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction . . . must . . . state its terms specifically[] and describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Defendants argue that some of Plaintiffs' proposed relief is insufficiently precise, including the proposed prohibition on "[a]ny change in the nature of postal services which will generally affect service on a nationwide or substantially

---

[21] As the Second Circuit has explained, district courts are permitted "to enter nationwide injunctions." New York v. United States Dep't of Homeland Sec., 969 F.3d at 88. The Court determines a nationwide injunction is appropriate here because, given the nationwide scope of Defendants' conduct, to impose anything less would "risk running afoul of the Constitution's guarantee of equal treatment." Gallagher, 2020 WL 4496849, at *23 (citing Bush, 531 U.S. at 109).

nationwide basis."[22] (Notice of Motion.)  Plaintiffs agree on
reply that the Court may narrow their requested relief as
appropriate.  See Richmond Tenants Org. v. Kemp, 956 F.2d
1300, 1308 (4th Cir. 1992) ("It is well established . . .
that a federal district court has wide discretion to fashion
appropriate injunctive relief . . . .").

While some of the requested elements of injunctive
relief are specific enough to pass muster under Rule 65(d),
other elements are too vague to be permissible. For example,
Plaintiffs request that the Court enjoin the enactment of any
rule, policy, or standard the purpose of which would delay
the delivery of mail to or from a government entity. But
government entities apart from state and local boards of
elections are outside the scope of this case. The Court will
therefore limit the scope of relief accordingly.

Finally, the Government argues -- in a footnote -- that
the Court lacks authority to enjoin the President in the
context of his official, non-ministerial duties. (Opposition
at 25 n.20.) The Government also argues that the same
principles that prevent federal courts from enjoining the

---

[22] Plaintiffs counter that this language is borrowed directly from a
statute that already governs USPS services and so does not impose any
additional investigative burden. (Reply at 19-20 (quoting 39 U.S.C. §
3661(b)).) However, courts have generally held that a restrained party
does not have fair notice of what conduct will risk contempt if the
injunction merely enjoins a party to obey the law or comply with an
agreement. Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1531 (11th Cir. 1996).

President's official acts also prevent them from entering declaratory relief.

Generally, arguments raised only in a footnote need not be considered. Weslowski v. Zugibe, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) (collecting cases). Nevertheless, the Court agrees with the Government's first proposition. See Mississippi v. Johnson, 71 U.S. 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties . . . ."). While it is an "open . . . question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," Franklin v. Massachusetts, 505 U.S. at 802, "the law is clear that the Court cannot issue such relief to require performance of official duties that are *not* ministerial." Citizens for Responsibility and Ethics in Washington v. Trump, No. 19 Civ. 1333, 2020 WL 619959, at *9 (D.D.C. Feb. 10, 2020). Because the duties at issue here appear entirely official and non-ministerial -- the running of a major department of the Executive Branch -- the type of broad injunctive relief Plaintiffs seek is unavailable as to the President. Napolitano v. Flynn, 949 F.2d 617, 622 (2d Cir. 1991) (actions are "ministerial" when "nothing is left to discretion").

The Court has some doubts as to the accuracy of the Government's argument that the Court may not even enter declaratory relief against the President. Indeed, the Government cites two recent cases from this district suggesting the contrary. See Pen American Center, Inc. v. Trump, 448 F. Supp. 3d 309, 327-28 (S.D.N.Y. 2020); Knight First Amendment Institute at Columbia Univ. v. Trump, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018), aff'd, 928 F.3d 226 (2d Cir. 2019), reh'g en banc denied, 953 F.3d 216 (Mem.). However, given that legal process is generally directed to lower-level executive officials, Nixon v. Sirica, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc), the Court need not decide the matter, because it finds that injunctive relief is available against DeJoy and the Postal Service. See Knight First Amendment Institute at Columbia Univ., 302 F. Supp. 3d at 579. Therefore, the Court will deny the Motion insofar as it seeks relief against the President.

## Conclusion

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. at 17. It may be, as Defendants' witness stated, that the Postal Service is facing a "perfect storm" of events causing delays in mail delivery. (Tr. 86:4.) The

Court fully understands that the Postal Service's operations face an exceptional test during the impending national election. But now, more than ever, the Postal Service's status as a symbol of national unity must be validated by the demonstrated degree of its commitment to utmost effectiveness of Election Mail service. And while the Court has no doubts that the Postal Service's workforce comprises hardworking and dedicated public servants, multiple managerial failures have undermined the postal employees' ability to fulfill their vital mission.

Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 19) is **GRANTED IN PART.** Plaintiffs are directed to submit a proposed second amended complaint as discussed above; and it is further

**ORDERED** that by not later than noon on September 25, 2020 the parties shall settle an Order providing Plaintiffs appropriate relief consistent with this opinion and notify the Court of such settlement. In the event the parties fail to file such notice by that date the terms of the following Order shall take effect without further action by this Court:

1. The United States Postal Service ("USPS") shall, to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express.

    a. For purposes of this Order, the term "Election Mail" shall refer to any item mailed to or from authorized election officials that enables citizens to participate in the voting process, including voter registration materials, absentee or mail-in ballot applications, polling place notifications, blank ballots, and completed ballots.

2. No later than September 25, 2020, USPS shall provide to this Court and Plaintiffs a cost estimate for treating all Election Mail as First-Class Mail beginning on October 15, 2020.

3. USPS shall pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020.

4. No later than October 1, 2020, USPS shall submit to the Court a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020, which are 93.88 percent for First-Class Mail and 93.69 percent for Marketing Mail, and shall thereafter make a good faith effort to fully implement the listed steps.

5. No later than September 25, 2020, USPS shall submit to the Court a list of all USPS recommended practices

concerning of the treatment of Election Mail that are
not binding policies.

6. USPS shall provide this Court and Plaintiffs with a
weekly update that includes:

   a. The same weekly update USPS is providing Congress;
      and

   b. Separate, unmerged 2-day and 3-5 day weekly service
      reports and variance reports; and

   c. A summary, not to exceed 10 pages in length, of any
      and all data and information collected regarding
      USPS's handling of Election Mail and compliance
      with the USPS policies regarding Election Mail,
      USPS recommended practices regarding Election Mail,
      and the terms of this Order specifically pertaining
      to Election Mail.

7. No later than September 29, 2020, USPS shall submit to
   the Court and Plaintiffs a proposed memorandum to all
   USPS managerial staff (the "Guidance Memorandum"). The
   proposed Guidance Memorandum shall in clear terms and
   with the aid of examples:

   a. Identify and explain all USPS policy requirements
      concerning the treatment of Election Mail;

   b. Identify and explain all USPS recommended practices
      concerning the treatment of Election Mail;

c. Clarify that late and extra trips are not banned, do not require pre-approval, and will not result in disciplinary action;

d. Clarify that late and extra trips that facilitate the prompt delivery of Election Mail are encouraged;

e. Explain that, pursuant to this Court's Order, to the extent excess capacity is available, Election Mail shall be treated as First-Class Mail or Priority Mail Express;

f. Explain that USPS has pre-approved all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020;

g. Direct managers to explain to each of their direct reports the policies and practices described in the Guidance Memorandum that are relevant to each direct report, taking into account their individual responsibilities;

h. Provide contact information for persons available to answer questions concerning the Guidance Memorandum; and

i. Provide contact information for persons responsible for tracking and responding to reports of

violations of USPS policies and recommended practices concerning the treatment of Election Mail and direct personnel to contact this person in the event of any such violation.

8. No later than October 1, 2020, Plaintiffs shall submit any comments concerning the Guidance Memorandum to this Court. Plaintiffs shall attach a copy of Defendants' proposed Guidance Memorandum containing any of Plaintiffs' suggested edits in track changes.

9. Within 7 days of the date of an Order of this Court approving the Guidance Memorandum, USPS shall certify to this Court whether all USPS managerial staff members have certified that they have read, reviewed, and understand the Guidance Memorandum; to the extent any managerial staff member has not yet certified that they have read, reviewed, and understand the Guidance Memorandum, USPS shall describe each attempt it has made to contact the relevant managerial staff member.

**SO ORDERED.**

Dated:    New York, New York
          21 September 2020

Victor Marrero
U.S.D.J.